[No. 45807.   En Banc.   December 31, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. LYNN D. HOUSER, *Petitioner.*

*C. C. Bridgewater, Jr.* (of *Walstead, Mertsching, Husemoen, Donaldson & Barlow*), for petitioner (appointed counsel for appeal).

*Henry R. Dunn, Prosecuting Attorney, Randolph Furman, Chief Deputy,* and *Kenneth C. Cowsert, Deputy,* for respondent.

WILLIAMS, J.—Defendant was convicted in the Superior Court for Cowlitz County on two counts of possession of a controlled substance. The charges were based on drugs found in the course of a search of a closed toiletry bag in the locked trunk of defendant's car after its impoundment. Defendant filed a motion to suppress the evidence, contending that the impoundment and search were unlawful. The trial court denied the motion and found defendant guilty. Division Two of the Court of Appeals affirmed the convictions, holding that the impoundment and search of defendant's car were reasonable. *State v. Houser,* 21 Wn. App. 30, 584 P.2d 410 (1978). We reverse.

The facts giving rise to this appeal are as follows: On April 8, 1977, at approximately 11:15 a.m., state trooper McNett, while on routine patrol, stopped defendant for making an improper turn in the city of Kelso. The car,

when stopped, was off the roadway next to a supermarket parking lot. When McNett asked defendant for his driver's license, defendant was unable to produce one. He attempted to identify himself, however, by producing a Quinault Indian Reservation employee permit on which the name Anthony Kimber appeared. Defendant also produced a temporary registration showing Anthony Kimber to be the registered owner of the car.

McNett ran a radio check on the name Anthony Kimber. The radio check revealed that the description of Anthony Kimber did not match defendant's. McNett then placed defendant under arrest for the improper turn and patted him down. Finding no weapon, McNett placed defendant in the patrol car.

McNett examined defendant's car in the area of the front seat to determine the car's ownership and he found an insurance claim application bearing the name Lynn Houser. McNett ran a radio check on that name and found that the description matched defendant's. The report further indicated that Houser's driver's license was suspended. He then advised defendant that he was under arrest for obstructing an officer and driving while his license was suspended. McNett advised defendant of his constitutional rights and informed him that he was taking him to jail. Apparently based on his observation that the vehicle bore an Oregon license plate, McNett then checked by radio to determine if the car was stolen, and he learned that the car was not listed as stolen. McNett frankly admits that at the time of the incident he did not have probable cause to believe that the car was stolen.

McNett asked defendant what he wanted done with the vehicle, and defendant gave him the names of several individuals to call who might take care of the car for him. McNett called several of them and finally reached Timothy Moss, who agreed to come and get the car. Sometime after the call, but before Moss arrived, McNett decided not to allow Moss to take the car; instead, he decided to impound it. He called a tow truck to get the car and radioed trooper

O'Neill to come to the scene. McNett asked O'Neill to perform a routine inventory search of the car while he took the defendant to jail. Defendant did not give permission for the impoundment or the search, and no warrant was obtained. In the course of the search, O'Neill opened the locked trunk of the car with a key obtained from defendant and found a shopping bag containing an assortment of pills, some of which were controlled substances. Inside the bag was a closed toiletry bag which also contained drugs. When Moss arrived on the scene, he was not permitted to take possession of the car. After completing the inventory search, O'Neill had the car towed away and then proceeded to the jail in order to give McNett the articles found in the locked trunk.

McNett took the items collected by O'Neill and put them in his evidence locker at patrol headquarters. He kept them there until the next day when he commenced his inventory of the items. Although the record is not fully clear on this point, it appears that the contraband which was the basis of defendant's conviction was discovered inside the closed toiletry bag which was inside the shopping bag. McNett turned the evidence over to the laboratory for analysis.

Contending that the evidence obtained during the inventory search should have been suppressed by the trial court, defendant challenges the propriety of the impoundment as well as the scope of the search. We find merit in both challenges. Each of these grounds is sufficient to warrant exclusion of the evidence.

## I

The general rule regarding the admissibility of evidence discovered during an inventory search accompanying the impoundment of a vehicle has been set forth in *State v. Montague,* 73 Wn.2d 381, 385, 438 P.2d 571 (1968), as follows:

> When . . . the facts indicate a lawful arrest, followed by an inventory of the contents of the automobile preparatory to or following the impoundment of the car, and

there is found to be reasonable and proper justification for such impoundment, and where the search is not made as a general exploratory search for the purpose of finding evidence of crime but is made for the justifiable purpose of finding, listing, and securing from loss, during the arrested person's detention, property belonging to him, then we have no hesitancy in declaring such inventory reasonable and lawful, and evidence of crime found will not be suppressed.

*See State v. Olsen,* 43 Wn.2d 726, 263 P.2d 824 (1953). Concomitantly, the court in *Montague* stated that

[n]either would this court have any hesitancy in suppressing evidence of crime found during the taking of the inventory, if we found that either the arrest or the impoundment of the vehicle was resorted to as a device and pretext for making a general exploratory search of the car without a search warrant. *State v. Michaels,* 60 Wn.2d 638, 374 P.2d 989 (1962); *People v. Garrison,* 189 Cal. App. 2d 549, 11 Cal. Rptr. 398 (1961).

*State v. Montague, supra* at 385. *See State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973). In determining whether the fruits of an inventory search following the impoundment of a vehicle are admissible evidence of a crime, our first inquiry, then, is whether the state can show reasonable cause for the impoundment.

The starting point for our analysis is the fourth amendment to the United States Constitution and Const. art. 1, § 7. Both provisions place a limitation on governmental searches and arbitrary intrusions into private affairs. *State v. Smith,* 88 Wn.2d 127, 559 P.2d 970 (1977); *Seattle v. See,* 67 Wn.2d 475, 408 P.2d 262 (1965). The purpose of these provisions is to prevent unreasonable searches and seizures without probable cause. *Seattle v. See, supra.* The reasonableness of a search or seizure must be decided in light of the facts and circumstances of the case. *South Dakota v. Opperman,* 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976).

Several theories have been forwarded to justify the impoundment of the vehicle in the present case. First, the State contends that Officer McNett properly impounded

the car on the basis of a suspicion that it might have been stolen.

██ As a general rule, warrantless searches and seizures are per se unreasonable. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). Nonetheless, there are a few "'jealously and carefully drawn' exceptions" to the warrant requirement which "provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Arkansas v. Sanders,* 442 U.S. 753, 759, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). *See Jones v. United States,* 357 U.S. 493, 499, 2 L. Ed. 2d 1514, 78 S. Ct. 1253 (1958). The burden is on the prosecutor to show that a warrantless search or seizure falls within one of these exceptions. *See Arkansas v. Sanders, supra.*

██ One circumstance in which a warrant is not required is where the police stop an automobile on the highway because they have probable cause to believe it contains contraband or evidence of a crime. *Arkansas v. Sanders, supra.* There are two reasons for this exception to the warrant requirement. First, the inherent mobility of automobiles makes rigorous enforcement of the warrant requirement impracticable. *Arkansas v. Sanders, supra; South Dakota v. Opperman, supra; Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925). Second, the expectation of privacy in regard to one's automobile is less than that relating to a home or office. *Arkansas v. Sanders, supra; South Dakota v. Opperman, supra; Cardwell v. Lewis,* 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464 (1974). In respect to the search and seizure of automobiles, the warrant requirement is subordinate to the requirement of probable cause. *Chambers v. Maroney,* 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970). Therefore, the impoundment of a vehicle will be considered reasonable if an officer has probable cause to believe that it was stolen or that it was being used in the commission of a felony. *See*

*State v. Glasper,* 84 Wn.2d 17, 523 P.2d 937 (1974); *State v. Singleton, supra.*

In this case, Officer McNett by his own admission did not have probable cause to believe the car was stolen, and defendant was not charged with theft. Indeed, according to McNett's testimony, it could at best be said that he was not sure "that it wasn't a stolen vehicle." Following his discovery that the defendant had given him a false identification and that the car was not registered in defendant's name, the officer made no further inquiry of defendant as to his right to possession of the car prior to its impoundment. He did not inquire as to the identity of Anthony Kimber or of any connection defendant might have with him. He did not inquire why defendant was in the area or even why he was using a car registered to another individual. No attempt was made to call Anthony Kimber at the phone number appearing on the employee permit. Nor did he run a check of the vehicle identification number to determine whether the car was reported stolen. Defendant had the keys to the car and nothing in the record indicates that the car had been "hot-wired". In short, McNett harbored a mere suspicion that the car was stolen, and it was this suspicion which caused the officer to impound the car.

A mere suspicion that a vehicle is stolen does not rise to the level of probable cause for the purpose of justifying an intrusion of Fourth Amendment rights. Accordingly, we find that the State has not sustained its burden of showing the impoundment was based on probable cause that the car was stolen.

Another theory used to justify the impoundment of the vehicle was offered by the Court of Appeals. That court noted the decision of *South Dakota v. Opperman, supra,* in which the high court observed, at page 368, that "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' . . . automobiles are frequently taken into police custody." (Citation omitted.) Because defendant both lied about his name and was

not the registered owner of the vehicle, the Court of Appeals concluded that

> [t]he officer in his community caretaker capacity had a duty to determine ownership of the car. He was entitled to take custody of the car to prevent its disappearance until he could determine the proper person to whom to release it. *See State v. Malbeck,* 15 Wn. App. 871, 552 P.2d 1092 (1976); *State v. Bresolin,* 13 Wn. App. 386, 534 P.2d 1394 (1975).

*State v. Houser,* 21 Wn. App. 30, 33, 584 P.2d 410 (1978).

We believe the Court of Appeals misconstrued the concept of the "community caretaking function" as used by the United States Supreme Court.

■ The characterization of some police actions as community caretaking functions appeared in the case of *Cady v. Dombrowski,* 413 U.S. 433, 441, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973). The court observed that:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents *in which there is no claim of criminal liability* and engage in what, for want of a better term, may be described as community caretaking functions, *totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

(Italics ours.)

Subsequently in *Opperman,* the United States Supreme Court related the concept of "community caretaking functions" to the impoundment of vehicles by the police. The court explained:

> In the interests of public safety and as part of what the Court has called "community caretaking functions," *Cady v. Dombrowski, supra,* at 441, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic–control activities. Police will also frequently remove and impound automobiles which violate parking ordinances

and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

(Footnote omitted.) *South Dakota v. Opperman, supra* at 368–69. The court further observed that in conjunction with these duties, the police frequently attempt to determine the ownership of abandoned cars. Thus, the court sanctioned the impoundment of an abandoned, illegally parked vehicle as falling within the "community caretaking functions" of the police.

It is clear that the vehicle in this case was impounded for reasons other than to carry out the community caretaking functions of the police as described in *Opperman.* The vehicle was in defendant's possession and was not abandoned. The State has not shown that it was impeding traffic or that it could not have been driven to a place where it would not impede traffic while defendant was in the custody of the police. *See State v. Bales,* 15 Wn. App. 834, 552 P.2d 688 (1976). There has been no showing that the vehicle threatened public safety or convenience in any way.[1] Rather, it is obvious that the vehicle was impounded in connection with the investigation of a crime, as a result of McNett's suspicion that the car was stolen. An impoundment for that purpose must meet the probable cause standard; it will not be permitted under the guise of the "community caretaking function" exception.

Since we find that impoundment of defendant's car cannot be justified under the theory set forth in *Opperman,* we must determine whether the impoundment of defendant's vehicle after his arrest was reasonable on any other ground.

___

[1]*Compare State v. Bresolin,* 13 Wn. App. 386, 534 P.2d 1394 (1975), where two suspects were arrested but a possible third suspect remained at large. The court sustained the impoundment of the vehicle because, among other reasons, leaving the vehicle in the street would have left it open to use by the third suspect.

■ Initially, we note that a reasonable alternative to impoundment existed. The police could have left the car parked and locked in its location on the public street, since it was midday and nothing in the record indicates the officer believed that the defendant's presence at the police station to post bond for the charges called for anything but a temporary absence. *State v. Singleton,* 9 Wn. App. 327, 333, 511 P.2d 1396 (1973). If it had later become apparent that defendant would not be able to return for the car and that it could not be left safely on the street, the officer could have ordered the impoundment at that time.

It is unreasonable to impound a citizen's vehicle following his or her arrest when there is no probable cause to seize the car and where a reasonable alternative to impoundment exists. *See State v. Bales, supra.* As expressed by the Court of Appeals in *State v. Hardman,* 17 Wn. App. 910, 913, 567 P.2d 238 (1977):

> Absent any express justification by the State in the record concerning the impoundment, the procedure risks creating a suspicion that it was a mere pretext for a general exploratory search of the car.

(Citation omitted.)

Accordingly, we believe the impoundment of defendant's vehicle was unreasonable and violative of his constitutional rights.

## II

As a further and equally compelling reason for suppressing the evidence found in the car, defendant argues that the scope of the inventory search of his vehicle exceeded the bounds of reasonableness and and was therefore unconstitutional. We agree.

■ The search in this case was an inventory search, as opposed to a probable cause search or a search incident to arrest. Inventory searches, unlike other searches, are not conducted to discover evidence of crime. Accordingly, a routine inventory search does not require a warrant. *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct.

2476 (1977). The criteria governing the propriety of inventory searches are largely unrelated to the justifications for other exceptions to the warrant requirement. *South Dakota v. Opperman,* 428 U.S. 364, 370 n.5, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976); *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir. 1979).

Although routine inventory searches pursuant to standard police procedures have been held reasonable, *South Dakota v. Opperman, supra,* an inventory search may not be unlimited in scope. The direction and extent of such searches must be restricted to effectuating the purposes which justify their exceptions to the Fourth Amendment. *United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978). Not every inventory taken in compliance with police department regulations is lawful and where a search is improper it cannot be legitimized by conducting it pursuant to standard police procedure. *State v. Jewell,* 338 So. 2d 633 (La. 1976).

We have long held that a noninvestigatory inventory search of an automobile is proper when conducted in good faith for the purposes of (1) finding, listing, and securing from loss during detention property belonging to a detained person; (2) protecting police and temporary storage bailees from liability due to dishonest claims of theft. *State v. Gluck,* 83 Wn.2d 424, 518 P.2d 703 (1974); *State v. Montague,* 73 Wn.2d 381, 385–87, 438 P.2d 571 (1968).[2] We recognize the importance and continuing validity of these interests.

---

[2]The court in *South Dakota v. Opperman,* 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976), recognized two additional purposes of the inventory search which have not previously been expressed in the case law of this state. These are: (1) the protection of police officers from potential danger; and (2) the protection of the public from vandals who might find a firearm or contraband drugs. *South Dakota v. Opperman, supra* at 369 and 376 n.10. These are valid and important purposes, but in most cases they have little relevance to the facts. Without more, these purposes will not serve to justify an inventory search in each and every case. *Compare Cady v. Dombrowski,* 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973), where police "were under impression" that an incapacitated driver, a Chicago police officer, was required to carry his service revolver at all times. In

In sanctioning such a search, however, we recognize the possibility for abuse and have required that the State show that the search was conducted in good faith and not as a pretext for an investigatory search. *Montague,* at 385. As a further protection against abuse, the scope of the search should be limited to those areas necessary to fulfill its purpose. Accordingly, it should be limited to protecting against substantial risks to property in the vehicle and not enlarged on the basis of remote risks.

In determining the propriety of the scope of an inventory search of an abandoned car, the court in *Opperman* approved an intrusion into the car's unlocked glove compartment. The court found such an intrusion to be reasonable in light of the valid objectives of an inventory search because documents of ownership and registration are customarily stored in the glove compartment and it often serves as a place for the temporary storage of valuables. In this case, we must inquire whether it was necessary for the police to examine the contents of a closed toiletry bag within a locked trunk in order to effectuate the valid purposes of an inventory search.

■ We do not believe that it was necessary to enter the locked trunk in order to serve these purposes. We note that the inventory search which was approved in *Opperman* extended only to the car's unlocked glove compartment.[3] Moreover, property locked in the trunk of an automobile, as here, presents no great danger of theft. It is apparent

---

*Cady,* the court permitted an inventory search of the locked trunk of the car on the grounds that the police had *reasonable grounds to believe* a firearm was in the car.

[3]Despite his concurrence with the majority, Justice Powell expressed some cynicism of the actual effectiveness of inventory searches in deterring false claims against the police. He wrote:

It is not clear, however, that inventories are a completely effective means of discouraging false claims, since there remains the possibility of accompanying such claims with an assertion that an item was stolen prior to the inventory or was intentionally omitted from the police records.

*South Dakota v. Opperman,* 428 U.S. 364, 378–79, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976) (Powell, J., concurring).

that a would–be thief would be unaware of the existence of property of value in the trunk. Indeed, countless numbers of automobiles with locked trunks are daily left on the city streets of this country without unreasonable risk of theft. Accordingly, we think that any need to protect property located in a locked trunk is outweighed by the countervailing privacy interests of the individual in the enclosed area of the trunk. *See State v. Singleton, supra; State v. Boster,* 217 Kan. 618, 628, 539 P.2d 294 (1975).

We therefore hold that an officer may not examine the locked trunk of an impounded vehicle in the course of an inventory search absent a manifest necessity for conducting such a search.[4]

In any event, the legitimate purposes behind an inventory search could have been effectuated by inventorying as a unit the closed toiletry kit in which the drugs were found. The United States Supreme Court has held that in the absence of exigent circumstances, luggage may not be searched in the course of a warrantless probable cause search of an automobile. *Arkansas v. Sanders,* 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979). The court, however, has not directed its attention to the issue of whether the contents of unlocked luggage found within an automobile may be examined in the course of an inventory search. Because the propriety of probable cause searches and inventory searches are governed by differing criteria,

---

[4]We need not speculate the circumstances which would constitute a "manifest necessity" justifying the inventory search of a locked trunk without the owner's consent. For the purposes of this Fourth Amendment question, it suffices to say that no such necessity was shown here. As stated by Chief Justice Burger in his concurring opinion in *Arkansas v. Sanders,* 442 U.S. 753, 768, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979):

The dissent complains that the Court does not adopt a "clear" rule, presumably one capable of resolving future Fourth Amendment litigation. That is not cause for lament, however desirable it might be to fashion a universal prescription governing the myriad Fourth Amendment cases that might arise. We are construing the Constitution, not writing a statute or a manual for law enforcement officers.

the ruling in *Sanders* is not determinative of the issue presently before this court.

Although the rule of *Sanders* may not be directly applicable here, some of the reasoning set forth in that opinion is relevant to our considerations. In determining whether the intrusion into a piece of luggage in the course of an inventory search is reasonable, the court must balance "the governmental and societal interests advanced to justify such intrusions against the constitutionally protected interest of the individual citizen in the privacy of his effects." *South Dakota v. Opperman,* 428 U.S. 364, 378, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976) (Powell, J., concurring); *United States v. Bloomfield,* 594 F.2d 1200–03 (8th Cir. 1979). We have already discussed the parameters of the governmental and societal interests in an inventory search; the reasoning of *Sanders* helps define the "constitutionally protected interest of the individual citizen in the privacy of his effects" which is to be balanced against those of the government and society.

In *Sanders,* the United States Supreme Court held that "there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places", *Arkansas v. Sanders, supra* at 763–64, despite the rule that a search warrant is not constitutionally required to stop and search an automobile on probable cause that it contains contraband or evidence of a crime. In so holding, the court shed light on the nature of a citizen's interest in the privacy of his luggage. The court reasoned, at page 764, that "the very purpose of a suitcase is to serve as a repository for personal items when one wishes to transport them." (Footnote omitted.) In a footnote to this statement, the court distinguished personal luggage from other types of containers and packages which do not deserve the full protection of the Fourth Amendment, *e.g.,* a kit of burglar tools or a gun case. By requiring that the police obtain a search warrant before conducting a probable cause search on unlocked personal luggage found in an

automobile, the court recognized a citizen's privacy interest in personal luggage, albeit unlocked, to be significant.[5]

Accordingly, our analysis leads to a balancing of the governmental and societal interests in an inventory search as set forth by this court in *Montague* against the citizen's interest in the privacy of personal luggage as discussed in *Sanders*. We conclude that where a closed piece of luggage in a vehicle gives no indication of dangerous contents, an officer cannot search the contents of the luggage in the course of an inventory search unless the owner consents. Absent exigent circumstances, a legitimate inventory search only calls for noting such an item as a sealed unit. If, however, the police have reason to believe a container "holds instrumentalities which could be dangerous even when sitting idly in the police locker" the police may and should search the contents of the container. *United States v.*

---

[5]*See also* the court's discussion of a citizen's expectations of privacy in relation to a double–locked footlocker found in an open trunk of an automobile. *United States v. Chadwick*, 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977). The court held that evidence gained by opening the locked footlocker without a warrant should be suppressed. Writing for the court, Chief Justice Burger stated in strong language:

> By placing personal effects inside a double–locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause. . . .
>
> . . .
>
> The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.

*United States v. Chadwick, supra* at 11–13.

Although the subject of this discussion was a double–locked piece of luggage, it should be considered applicable to all personal luggage, whether locked or unlocked, in light of footnote 9 in *Sanders*, which states, "nor did respondent's failure to lock his suitcase alter its fundamental character as a repository for personal, private effects." *Arkansas v. Sanders*, 442 U.S. 753, 762 n.9, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979).

*Bloomfield, supra* at 1203.

Our conclusion accords with that reached by the Supreme Court of Colorado in the case of *People v. Counterman,* 192 Colo. 152, 556 P.2d 481 (1976). The court held that police had exceeded the proper scope of an inventory search in opening and searching the contents of a knapsack. The court noted that the contents were securely sealed and did not give any indication of danger or other reasons for special inventory. It was concluded that the legitimate purposes of the inventory search could have been fully accomplished by noting the knapsack as a sealed unit, and by offering the defendant a choice of a full inventory of the contents. In *United States v. Bloomfield, supra,* the United States Court of Appeals for the Eighth Circuit recently considered a similar issue to the one in *Counterman* and reached the same conclusion. The court reasoned, at page 1202:

> In this instance, because the knapsack was tightly sealed and there was no danger of anything slipping out, the first two purposes [of the inventory search] are better served if the knapsack is inventoried as a unit. In this way the knapsack which is locked up as a whole in police headquarters, has never been opened and its contents have never been removed, reshuffled and replaced. To our minds, this would minimize the possibility of loss and the possibility of false claims against police by the owner.

*Accord, Mozzetti v. Superior Court,* 4 Cal. 3d 699, 484 P.2d 84, 94 Cal. Rptr. 412 (1971). *See also State v. Daniel,* 589 P.2d 408 (Alaska 1979); *United States v. Markland,* 489 F. Supp. 932 (D. Conn. 1980).

The procedures suggested in *Counterman* and *Bloomfield* advance the societal and governmental interests underlying the inventory search and at the same time protect the interests of the individual citizen in the privacy of his effects. By searching the contents of the closed toiletry bag in defendant's car, the police exceeded the bounds of a proper inventory search.

## III

For all of these reasons, the evidence obtained during the search of defendant's car should have been excluded at his trial. The convictions are reversed.

UTTER, C.J., and ROSELLINI, BRACHTENBACH, DOLLIVER, and HICKS, JJ., concur.

DORAN, J.* (dissenting)—The majority considers and decides three issues: (1) whether the impoundment of the vehicle under the facts and circumstances existing at the time of defendant's lawful arrest was reasonable and justifiable; (2) whether the scope of the preimpoundment inventory search which extended to items in the locked trunk of the vehicle exceeded the bounds of reasonableness; and (3) whether the inventory of items in a so–called "closed" toiletry kit found within a shopping bag of drugs in the locked trunk was unreasonable because the kit could have been inventoried as a unit.

The defendant contends on each of these issues that the troopers' actions were unreasonable. The majority agrees and reverses the convictions.

The majority's conclusion on the first issue that "the impoundment of defendant's vehicle was unreasonable and violative of his constitutional rights," requires that the convictions be set aside. Therefore, it is unnecessary for the majority to reach and render an advisory opinion on the two inventory search issues. Though the issues as framed may require a decision by the court sometime in the future, I would suggest that the majority withhold announcing any new, far–reaching rules until the proper factual case is presented. In this respect I believe the majority should be guided by the views expressed by Mr. Chief Justice Burger in his concurring opinion in *Arkansas v. Sanders*, 442 U.S. 753, 768, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979):

---

*Judge Robert J. Doran is serving as a judge pro tempore of the Supreme Court pursuant to Const. art. 4, § 2A (amendment 38).

My disagreement with the Court's opinion is very different from that of the dissenters. Our institutional practice, based on *hard experience,* generally has been to refrain from deciding questions not presented by the facts of a case; *there are risks in formulating constitutional rules broader than required by the facts to which they are applied.*

(Italics mine.)

### IMPOUNDMENT OF THE VEHICLE

The rule in this state is that, following a lawful arrest, an officer, in the absence of an authorizing statute or ordinance, may order impoundment of a vehicle only for reasonable cause. *See, e.g., State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968); *State v. Hardman,* 17 Wn. App. 910, 567 P.2d 238 (1977); *State v. Greenway,* 15 Wn. App. 216, 547 P.2d 1231, *review denied,* 87 Wn.2d 1009 (1976); *State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973). "Reasonable cause" is to be determined by an examination and evaluation of all of the facts and circumstances existing at the time the arrest is made and the impoundment is ordered. *See State v. Greenway, supra* at 219.

In my opinion, the defendant by his own lies and deception created a rather unusual, if not unique, situation for trooper McNett. After stopping defendant for a traffic violation, McNett asked him for his driver's license. Defendant stated he did not have his license as he had left it at home. In response to the trooper's request for some identification, he provided *from his wallet* a Quinault Indian Reservation employee's permit bearing the name Anthony Kimber and an Oregon temporary vehicle registration showing that name. By running a radio check on the name of Anthony Kimber, McNett discovered Kimber's description did not match that of defendant. In the passenger's compartment in the front seat area, McNett found an insurance claim application form bearing the name of Lynn Houser. Checking this name, the trooper found the description matched that of the defendant. He also discovered Houser's driver's license had been suspended. Defendant was first lawfully

arrested for making an improper lane change. Later, as a result of the investigation, defendant was lawfully arrested for obstructing a public servant and driving while his license was suspended. The trooper then faced the question of what should be done with the car.

Initially, Trooper McNett obtained from defendant the names of some people to whom he could release the vehicle. This procedure is consistent with the holdings in *State v. Bales,* 15 Wn. App. 834, 552 P.2d 688 (1976) and *State v. Hardman, supra.* It does not appear from the record that Anthony Kimber's name was among those proffered by the defendant. Nevertheless, McNett called several of these individuals and finally reached Timothy Moss who agreed to take charge of the car.

Prior to the time when Moss arrived, McNett found the vehicle title and other information in the vehicle identifying the owner as Anthony Kimber. At this point he determined that, under the circumstances, releasing the car to anyone designated by defendant would be inadvisable and he ordered the car impounded. McNett testified that he believed the car should be held for a period of time to allow him to establish ownership. Although he had made a radio check to determine if the vehicle had been reported as stolen, the inquiry was based solely on the Oregon license plates and did not include a check of the vehicle identification number. As the trial judge observed, "license plates obviously are easily switched."

Defendant's sole contention in the trial court and before the Court of Appeals, and his principal contention here, was that the impoundment was not justified "where there was available a local resident (Mr. Moss) who was willing to take possession of the vehicle from the officers." I agree that where the owner of a vehicle is taken into custody an effort should be made to release the vehicle to the owner's agent rather than impound it. Here, the defendant was neither the apparent owner of the car nor did he ever claim, at the scene, prior to impoundment, that he was a friend of

the owner from whom he had borrowed the car. More significantly, here, the defendant *misrepresented himself as the owner and provided identification from his wallet* in an attempt to conceal his true identity. Under these circumstances, both the trial court and the Court of Appeals agreed with the trooper's decision not to turn the car over to Moss. I also agree and suggest the facts speak for themselves.

As the prosecutor states in his brief:

> Imagine, if you will, explaining to the real Anthony Kimber that the State Patrol stopped his car, found it driven by Lynn Houser, who tried to claim he was Anthony Kimber, arrested Houser and then turned the car over to Houser's friend for safekeeping.

In reaching its conclusion that impoundment was not based on *any* reasonable ground, the majority states that as a *reasonable* alternative, the police could have left the car parked and locked in its location on the public street.[6] The alternative which the majority now finds reasonable is based upon several assumptions which are not supported by the record. Specifically, the court assumes that the car was parked on a public street and that the defendant's arrest would involve only a temporary absence.[7]

---

[6]The majority opinion may create some confusion as to how many alternatives to impoundment an officer must consider before impoundment may be ordered. Stated another way, is the majority holding, contrary to *State v. Hardman,* 17 Wn. App. 910, 567 P.2d 238 (1977), that an officer must exhaust all *possible* alternatives before his action will be considered "reasonable"? The only alternative specifically discussed by the majority—leaving the car in the street—was not considered by either the officer or the defendant at the time of the arrest. It was raised as an alternative for the first time on appeal. On the other hand, the only alternative considered and rejected by the trooper—releasing the car to defendant's friend Moss—is nowhere discussed in the majority's opinion. Without any explanation, the majority's failure to discuss the alternative of turning the car over to Moss suggests that they too find this alternative unreasonable under the circumstances.

[7]In *State v. Singleton,* 9 Wn. App. 327, 333, 511 P.2d 1396 (1973), cited by the majority, the bail for the traffic offense was $25. Here bail according to JTR 2.03, the schedule adopted by this court, would be $275: (1) driving while license suspended, $250; and (2) improper lane change, $25. In addition, defendant was

I agree with the majority that the "community caretaking functions" recognized in *South Dakota v. Opperman,* 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976) would have to be expanded to apply in this case; however, the inquiry does not end there because "reasonable cause" must be determined on the factual circumstances of this case. *State v. Greenway, supra* at 219. As the court stated in *Opperman*:

> The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts."

*Opperman,* at 373, quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 509–10, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971) (Black, J., concurring and dissenting). This requires, of necessity, some fine line drawing and a judgmental decision based upon the facts presented. *See Arkansas v. Sanders, supra* at 753 and *State v. Smith,* 88 Wn.2d 127, 134, 559 P.2d 970 (1977).

It is clear to me from reading the testimony of Trooper McNett and the oral opinion of the trial judge that impoundment was ordered in good faith to protect the car and its contents for the owner. Thus, there is no basis for any "suspicion that it was a mere pretext for a general exploratory search of the car." Even counsel for defendant, in oral argument before this court, conceded that impoundment was not a pretext for an exploratory search of the car. *Cf. State v. Michaels,* 60 Wn.2d 638, 644–45, 374 P.2d 989 (1962); *State v. Hardman, supra.*

Trooper McNett did what he reasonably could be expected to do in attempting to ascertain the ownership of

---

also arrested for obstructing a public servant, a misdemeanor offense for which there was no established bail and a court appearance would, therefore, be necessary to secure release.

It is also interesting to note that the impoundment of defendant's vehicle upheld in *State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968) followed the inability of the defendant to post bail in the amount of $34, without any showing that the officers prior to impoundment considered *any* alternative. *See also State v. Greenway,* 15 Wn. App. 216, 547 P.2d 1231 (1976) where bail on a felony charge in the amount of $250 was one of the facts considered in sustaining the impoundment of the defendant's vehicle.

the vehicle. His roadside inquiry left him unsatisfied. While I agree that Trooper McNett did not have probable cause to believe the vehicle to be stolen so as to justify impoundment on that ground, I believe he acted responsibly and in good faith in taking the step of impounding the vehicle for the limited purpose of ascertaining the true ownership and status of the vehicle.

Although what I regard to be the "care–taking function" undertaken by the trooper in this case can be distinguished from the functions recognized in *Opperman,* such distinction is not critical. In my opinion the functions described in *Opperman* are not exclusive.

Because of the unique factual situation created by the defendant's duplicity and the unquestioned good faith of the trooper, I agree with the trial judge and Division Two of the Court of Appeals that the impoundment here met the Fourth Amendment test of reasonableness.

### INVENTORY SEARCH OF LOCKED TRUNK

After impoundment was ordered, a complete inventory search was made by Trooper O'Neill pursuant to the standard procedure of the state patrol. In the locked trunk of the vehicle the trooper discovered a shopping bag of drugs in which he found a small toiletry kit also containing some drugs.

While there is nothing in the record to disclose the basis for the state patrol standard inventory procedure, it is reasonable to assume it was based, at least in part, on the views expressed by this court in *State v. Gluck,* 83 Wn.2d 424, 518 P.2d 703 (1974). In that case this court stated:

We do not, however, feel that the state's assertion that the search was justified as an inventory of the vehicle and its contents prior to impoundment is a valid one in this context. While we have long recognized inventory searches as a practical necessity, *State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968); *State v. Olsen,* 43 Wn.2d 726, 263 P.2d 824 (1953); *State v. Patterson,* 8 Wn. App. 177, 504 P.2d 1197 (1973); *State v. Jones,* 2 Wn. App. 627, 472 P.2d 402 (1970); *State v. Potts,* 1 Wn.

App. 614, 464 P.2d 742 (1969), we have also insisted that they be conducted in good faith for the purposes of (1) finding, listing, and securing from loss during detention, property belonging to a detained person, (2) protecting police from liability due to dishonest claims of theft, and (3) protecting temporary storage bailees against false charges. *State v. Montague, supra* at 385–87; *State v. Michaels,* 60 Wn.2d 638, 644–46, 374 P.2d 989 (1962).

The record here reveals merely that the officers at trial asserted that they "pulled an inventory search of the vehicle for personal property." The record does not indicate that the officers made *a complete list* of other items in the vehicle nor was it asserted that the officers *completely searched,* both under the *hood and in the trunk,* the entire vehicle after they found the incriminating bag. Without more, it cannot fairly be characterized as an inventory search.

(Italics mine.) *Gluck,* at 428–29.

I believe the reference to "under the hood" is based upon the holding in *State v. Olsen,* 43 Wn.2d 726, 263 P.2d 824 (1953). The reference to "in the trunk" apparently is based upon the decision of the Court of Appeals in *State v. Potts,* 1 Wn. App. 614, 464 P.2d 742 (1969).

In affirming the trial court in the instant case, Division Two of the Court of Appeals recognized the purposes of an inventory search as stated in *State v. Gluck, supra,* and *State v. Montague,* 73 Wn.2d 381, 438 P.2d 571 (1968), and the impact of the United States Supreme Court's opinion in *South Dakota v. Opperman, supra:*

In order to effectuate these purposes, it was necessary for the police to check the car's trunk as well as its interior. We are aware of narrow interpretations of *South Dakota v. Opperman, supra,* wherein the Supreme Court upheld an inventory search of an unlocked glove box. However, we find nothing in *Opperman* which would invalidate our previous holding that inventory searches of locked trunks are constitutionally permissible. *State v. Potts,* 1 Wn. App. 614, 464 P.2d 742 (1969). *See also* Annot., 48 A.L.R.3d 537 (1973).

*State v. Houser,* 21 Wn. App. 30, 34, 584 P.2d 410 (1978).

Without considering *Potts,* without reference to the description of an inventory search in *Gluck,* and without citation of supporting authority, the majority establishes a *new* standard governing the scope of inventory searches. The majority has reached the conclusion that an officer may not examine the locked trunk of an impounded vehicle in the course of an inventory search absent a *manifest necessity* for conducting such a search. Anticipating the obvious question, the majority states in footnote 5:

> We need not speculate the circumstances which would constitute a "manifest necessity" justifying the inventory search of a locked trunk without the owner's consent.

The court's single–minded emphasis in formulating this new standard is that the trunk of an automobile presents no great danger of theft. I disagree. To forbid entry into the trunk as part of a routine inventory search frustrates the very purpose of the inventory, since the trunk is a likely place for valuables to be stored. *Accord, State v. Ruffino,* 94 N.M. 500, 612 P.2d 1311 (1980). Unlike the majority's analogy to automobiles with locked trunks left on city streets, an impounded vehicle is more susceptible to theft because it is unattended for perhaps a number of days at a storage lot.[8] More importantly, however, the majority fails to take into consideration the other objectives in conducting an inventory (*i.e.,* the protection of public safety and the protection of the police from danger or from liability

---

[8]The difference was recognized by Justice Powell in his concurring opinion in *Opperman:*

> The protection of the owner's property is a significant interest for both the policeman and the citizen. It is argued that an inventory is not necessary since locked doors and rolled–up windows afford the same protection that the contents of a parked automobile normally enjoy. But many owners might leave valuables in their automobile temporarily that they would not leave there unattended for the several days that police custody may last. There is thus a substantial gain in security if automobiles are inventoried and valuable items removed for storage. And, while the same security could be attained by posting a guard at the storage lot, that alternative may be prohibitively expensive, especially for smaller jurisdictions.

(Footnotes omitted.) *South Dakota v. Opperman, supra* at 379 (Powell, J., concurring).

for claimed thefts. *See South Dakota v. Opperman,* 428 U.S. 364, 369, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976); *State v. Gluck, supra).* Finally, in formulating this new standard, the majority has brought about a subtle shift in emphasis away from a balancing of the competing interests in light of all of the facts and circumstances of a particular case toward compliance with a nebulous per se standard of law upon which the majority declines to elaborate.

I agree that the majority need not engage in any speculation on what constitutes manifest necessity. On the other hand, the majority need not and should not reach the issue. It appears that the majority has established a new standard that will require interpretation by trial judges in future cases without any guidance from the majority. The burden of proof is not simply one of necessity but of manifest necessity. As far as I am aware, no other court has adopted such a standard.[9]

I believe the inventory of items in the locked trunk of the vehicle ostensibly belonging to Anthony Kimber (and driven by defendant) was conducted in good faith, pursuant to standard state patrol practices, for the purposes recognized in *State v. Montague, supra,* and was reasonable and, therefore, constitutional under the facts of this case. *See State v. Gluck, supra; State v. Potts, supra.*

---

[9]Application of the "manifest necessity" standard would appear to bar even an inventory search such as the one approved in *Cady v. Dombrowski,* 413 U.S. 433, 441, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973), since the officers there only had *reasonable grounds* to believe that there was a revolver in the locked trunk of the vehicle. In discussing the *Dombrowski* case, the court in *Opperman* stated:

> The sole justification for the warrantless incursion was that it was incident to the caretaking function of the local police to protect the community's safety. Indeed, the protective search was instituted solely because local police "were under the impression" that the incapacitated driver, a Chicago police officer, was required to carry his service revolver at all times; *the police had reasonable grounds* to believe a weapon might be in the car, and thus available to vandals. The Court carefully noted that the protective search was carried out in accordance with *standard procedures* in the local police department, a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function.

(Citations omitted. First italics mine.) *South Dakota v. Opperman, supra* at 374.

## INVENTORY OF ITEMS IN THE TOILETRY KIT

After finding two constitutional grounds for reversing the drug convictions, the majority proceeds to render an advisory opinion on the so–called closed toiletry kit issue. This issue was not raised in the trial court[10] and, in the light of the holdings on the other issues, it is not necessary for the majority to reach the same.

The record is insufficient to establish that the toiletry kit was (1) closed or (2) the drugs upon which the charges were based were found therein. There is, thus, no factual basis for the conclusions reached by the majority. In an appropriate case, this court may be called upon to determine whether the holdings in *Arkansas v. Sanders,* 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979) (involving a search of a *closed* but unlocked suitcase), *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977) (a double–locked footlocker) and *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir. 1979) (a securely sealed knapsack) should be applied to *closed* "luggage" found during an inventory search. This is not the case.

I would affirm the convictions by upholding the good faith impound and the search of the locked trunk under the unusual, if not unique, facts and circumstances of this case. Unlike the new public policy rule announced in *State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978), which operated prospectively only, the new standard of the majority will have an impact and require reversal of a number of criminal cases decided under the prior rules. With the scope of the majority opinion in mind, I believe the views expressed by Justice Brachtenbach in his dissenting opinion in *Hehman* bear repeating here:

---

[10]It should be noted trial was held on May 13, 1977. On that date *Arkansas v. Sanders,* 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979); *United States v. Chadwick,* 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (decided June 21, 1977) and *United States v. Bloomfield,* 594 F.2d 1200 (8th Cir. 1979), cited by the majority, had not yet been decided.

Under the majority ruling the officer almost needs an appellate court riding his patrol vehicle to advise of the changing nature of the rules.

*State v. Hehman, supra* at 51 (Brachtenbach, J., dissenting).

I dissent.

HOROWITZ, J., concurs with DORAN, J. Pro Tem.