[No. 47829-0-I.   Division One.   January 14, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. ADAM LAMOUR
ACREY, *Appellant*.

*Christopher Gibson* (of *Nielsen, Broman & Associates, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Daniel J. Clark, Deputy*, for respondent.

ELLINGTON, J. — At almost one in the morning, 12-year-old Adam Acrey's mother asked police officers to give her son a ride home from an isolated area where he was found with four other unsupervised boys. Before placing Acrey into his patrol car to transport him home, an officer did a pat-down frisk for officer safety purposes and found drugs. Acrey contends the officers should never have called his mother and that his detention for that purpose exceeded the officers' legitimate community caretaking functions. Because Acrey was a young, unsupervised juvenile who had been stopped for a valid criminal investigation, the officers' community caretaking duties justified a brief detention for the purpose of telephoning his mother. We affirm the juvenile court's refusal to suppress.

## FACTS

Around 12:40 in the morning of September 18, 2000, several Renton police officers responded to a 911 call reporting juveniles fighting near the 900 block of Rainier Avenue. They spotted five young boys, including Acrey, and stopped them to see if they had been fighting. The boys denied fighting and said that they had just been "playing around."

The officers concluded there had been no fight and no one was injured. They had the boys sit on the sidewalk and requested their names and telephone numbers. Acrey gave a false name, but gave his correct number. Wilkinson telephoned Acrey's mother, who gave him her son's correct name and asked Wilkinson to bring her son home because she did not have a car.

Honoring the mother's request, Wilkinson instructed Officer Gould to drive Acrey home. Before placing Acrey into his patrol car, Gould did a standard pat-down for weapons, and felt an object in Acrey's pant leg. Acrey claimed the object was cash, but it did not feel like cash to Gould. Because he could not tell what it was, Gould decided to remove it to verify it was not a weapon. Gould pulled on a rubber band wrapped around Acrey's ankle. Cash and two baggies of marijuana fell from Acrey's pant leg. Gould found more marijuana and cash, as well as cocaine, during a search incident to Acrey's arrest.

The State charged Acrey with possession of cocaine and possession of less than 40 grams of marijuana. Acrey moved to suppress, arguing the seizure and search were unlawful. The juvenile court found that the officers had reasonable suspicion to stop Acrey to investigate a fight, and had lawful grounds to extend the stop as part of their community caretaking functions. The court also ruled that Gould was entitled to frisk Acrey for safety reasons, and that removing the object felt in his pant leg was within the proper scope of that frisk. The court admitted the evidence and Acrey was adjudicated guilty. Acrey appeals.

## ANALYSIS

■ ■ Warrantless seizures are per se unreasonable under the Fourth Amendment of the United States Constitution and article I, section 7 of the Washington Constitution, subject to a few " 'jealously and carefully drawn' " exceptions.[1] The State bears the burden of proving a warrantless seizure falls within an exception.[2]

■ Under *Terry v. Ohio*,[3] an officer may briefly stop a person to investigate a possible crime.[4] A *Terry* detention is limited in scope and duration to fulfilling the investigative purpose of the stop.[5] Once the officer confirms no crime was committed, he must end the stop unless additional suspicion arises.[6] Acrey concedes that his initial stop was valid under *Terry*. He argues, however, that once the officers confirmed he was not involved in a crime, they were required to release him.

■ But "local police have multiple responsibilities, only one of which is the enforcement of criminal law."[7] Many people look to the police to assist them in a variety of circumstances beyond the realm of law enforcement, "including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid."[8] In this case, once the officers determined that no crime had been committed, their focus shifted from law enforcement to ensuring the welfare of

---

[1] *State v. Kinzy*, 141 Wn.2d 373, 384, 5 P.3d 668 (2000) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)), *cert. denied*, 531 U.S. 1104 (2001).

[2] *Kinzy*, 141 Wn.2d at 384; *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997).

[3] 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[4] *State v. Glover*, 116 Wn.2d 509, 513, 806 P.2d 760 (1991).

[5] *State v. Williams*, 102 Wn.2d 733, 738-40, 689 P.2d 1065 (1984).

[6] *Williams*, 102 Wn.2d at 738-40.

[7] *See* Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. CHI. LEGAL F. 261, 261 (1998).

[8] *Hudson v. City of Wenatchee*, 94 Wn. App. 990, 996, 974 P.2d 342 (1999); *accord Kinzy*, 141 Wn.2d at 387.

Acrey and his young friends. The narrow question presented here is whether the officers' community caretaking functions allowed them to detain Acrey long enough to call his mother.

■■■■ The community caretaking function is a recognized exception to the warrant requirement.[9] It is totally divorced from a criminal investigation.[10] In performing this function, an officer may approach, detain, and question a person under circumstances that may require the officer to provide aid or assistance.[11] Because the officer's purpose is not criminal investigation, courts do not use traditional warrant-based analysis to evaluate police conduct in the community caretaking scenario.[12] Instead, courts use a balancing test that focuses on reasonableness:

> Under a routine check on safety, "[w]hether an encounter made for noncriminal noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a 'community caretaking function.' "[13]

Courts must "cautiously apply the community caretaking function exception because of the potential for abuse."[14] Once the community caretaking function applies, police officers may conduct a noncriminal investigation so long as it is necessary and strictly relevant to the community caretaking task at hand.[15]

In this case, we must balance the State's significant interest in protecting a child against the child's significant

---

[9] *Kinzy*, 141 Wn.2d at 385-86.

[10] *Kinzy*, 141 Wn.2d at 385 (citing *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)).

[11] *Kinzy*, 141 Wn.2d at 386-87; *State v. Chisholm*, 39 Wn. App. 864, 867, 696 P.2d 41 (1985).

[12] Livingston, *supra*, at 290-93.

[13] *Kinzy*, 141 Wn.2d at 387 (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)).

[14] *Kinzy*, 141 Wn.2d at 391.

[15] *Kinzy*, 141 Wn.2d at 388.

interest in moving free of police intrusion.[16] Raising child welfare concerns were the facts that Acrey was a 12-year-old boy, out after midnight on a weeknight without adult supervision, in an isolated area with no residences or open businesses. Most notably, the officers had stopped Acrey to conduct a criminal investigation in response to a citizen 911 call. Thus, there was reason for heightened concern that the boys may be engaging in conduct that, while not criminal, could bring harm to themselves or others. The record indicates that the time required for the officer to reach Acrey's mother was no more than a matter of minutes. The officers' conduct seems entirely reasonable.

Acrey argues that *State v. Kinzy*[17] prohibited the detention that occurred in this case. In that case, 16-year-old Kinzy was walking on the sidewalk of a downtown Seattle street at about 10 P.M. on a weeknight. A police officer stopped her because of the hour, and because she looked younger than 16 and was with an adult male the officer knew to be involved with narcotics. When Kinzy tried to walk away, the officer physically detained her. A later search revealed cocaine. After carefully balancing the officers' concerns for Kinzy's welfare against Kinzy's right to be free from government intrusion, our Supreme Court concluded that the officer could approach and question Kinzy to see if she needed help.[18] The court held, however, that Kinzy's interest in freedom of movement outweighed the State's interest in child welfare protection,[19] and physically detaining her therefore fell outside the community caretaking function exception to the warrant requirement.[20]

*Kinzy* teaches that we must examine the particular facts of each police encounter to determine whether the officers

---

[16] *Kinzy*, 141 Wn.2d at 390-92.

[17] 141 Wn.2d 373, 384, 5 P.3d 668 (2000), *cert. denied*, 531 U.S. 1104 (2001).

[18] *Kinzy*, 141 Wn.2d at 389.

[19] *Kinzy*, 141 Wn.2d at 391-92.

[20] *Kinzy*, 141 Wn.2d at 391.

acted reasonably under the circumstances.[21] Here, several important facts tip the scales in favor of briefly detaining Acrey while officers called his mother: Acrey was younger than Kinzy, and the hour much later; Acrey was in an isolated area unaccompanied by an adult; and most important, the officers had initially detained Acrey to investigate a possible crime. The fact that a 911 call had been placed raised at least some degree of concern for Acrey's well-being, regardless of whether there was any criminal activity; the next person to notice the boys "playing around" might have responded with something less benign than a 911 call. Perhaps most important, the fact that Acrey had been legitimately detained in a *Terry* stop meant that there was merely a momentary additional intrusion for community caretaking purposes.[22]

We also emphasize that the officers' purpose in detaining Acrey was to confer with his mother. In *Kinzy*, the court suspected the officer was actually enforcing a de facto curfew law, thereby abusing the community caretaking function.[23] One reason juvenile curfew laws are disfavored is because they tend to interfere with parents' rights to choose whether to allow their children out at night.[24] Here, the officers explicitly deferred that decision to Acrey's mother. Thus, this brief seizure served the additional purpose of advancing a mother's right to direct her child's upbringing.[25]

In determining the reasonableness of a governmental intrusion, courts consider the totality of the circumstances, balancing the character of the intrusion and its justification

---

[21] *See Kinzy*, 141 Wn.2d at 390-91; *see also* Livingston, *supra*, at 312.

[22] *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977).

[23] *Kinzy*, 141 Wn.2d at 391, 395 (citing *State v. J.D.*, 86 Wn. App. 501, 937 P.2d 630 (1997) (holding juvenile curfew law unconstitutional).

[24] *J.D.*, 86 Wn. App. at 507.

[25] *See Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (parents have a fundamental right to direct the upbringing of their children).

against the individual's right to personal autonomy.[26] Considering those competing interests, we conclude that the State's interest in protecting Acrey outweighed Acrey's interest in moving freely for the brief time it took the officers to call his mother. The brief extension of what had been a valid *Terry* stop occurred in a lawful exercise of the officers' community caretaking duties.

■ Acrey does not dispute that once his mother requested the officers' assistance in bringing him home, their community caretaking duties required them to comply with her request. Acrey also does not dispute that Gould was justified in patting him down before placing him into his patrol car for his safety. Acrey is correct. An officer is entitled to frisk for weapons before placing an individual in his patrol car.[27] Once the frisk revealed an unidentified object, safety concerns allowed Gould to take the steps necessary to assure himself that the object was not a weapon.[28] The detention and search that followed were reasonable under the Fourth Amendment.

Affirmed.

AGID, C.J., and BAKER, J., concur.

Review granted at 147 Wn.2d 1008 (2002).

---

[26] *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); *State v. McKinnon*, 88 Wn.2d 75, 78-79, 558 P.2d 781 (1977).

[27] *State v. Wheeler*, 108 Wn.2d 230, 235-36, 737 P.2d 1005 (1987).

[28] *See State v. Hudson*, 124 Wn.2d 107, 113, 874 P.2d 160 (1994) ("If the officer feels an item of questionable identity that has the size and density such that it might or might not be a weapon, the officer may only take such action as is necessary to examine such object." (citing *Terry*, 392 U.S. at 30)).