

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE SEP 2 6 2019

for CHIEF JUSTICE

This opinion was
filed for record
at 8am on Sept 26, 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | No. 96069-1 |
| | ) | (consolidated with No. 96073-9) |
| v. | ) | |
| | ) | |
| MICHAEL NELSON PECK, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | Filed    SEP 2 6 2019 |
| | ) | |
| v. | ) | |
| | ) | |
| CLARK ALLEN TELLVIK, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

GONZÁLEZ, J.—We are asked to answer two questions under article I, section 7 of our state constitution: first, whether defendants have standing to challenge the scope of a warrantless inventory search of a vehicle when that vehicle is stolen and, second, whether a proper inventory search extends to opening an innocuous, unlocked container of unknown ownership found in a stolen vehicle associated with defendants who were apprehended while burglarizing a home. We hold that the defendants have automatic standing to challenge the search and that the search of the innocuous container was lawful under these circumstances. We reverse the Court of Appeals and uphold the denial of the motion to suppress.

## FACTS

On Friday, January 23, 2016, Michael Peck and Clark Tellvik were seen on a security camera, burglarizing a home. The owner of the home was demonstrating her home's new surveillance system to a friend on her phone when she saw the crime in progress. She called 911, and officers arrived at the home within minutes.

When officers arrived, a Dodge Dakota pickup truck was stuck in the snow in front of the house. Peck and Tellvik were outside the truck, trying to free it from the snow. The officers contacted Peck and Tellvik, frisked them, and detained them. Additional responding officers arrived within minutes, ran the

registration of the vehicle, and discovered it was stolen. At this point, it was about 1:21 a.m. The officers arrested Peck and Tellvik for possession of a stolen vehicle.

After Peck and Tellvik were read their *Miranda*[1] rights, Peck agreed to speak with an officer. Peck said he had been picked up earlier in the day in the Dodge Dakota pickup by Tellvik. Peck told the officer that he had never seen Tellvik drive the pickup and that Tellvik started it with a screwdriver.

The officer asked if Peck and Tellvik had gone in any of the buildings or the house. Peck assured the officer that they had not. The officer also asked Peck if he had anything in the vehicle. After some equivocation, Peck said that a cell phone, a car battery, and a small bag of tools belonged to him. Peck told the officer that the vehicle was not running well, so they brought the battery and tools just in case the truck broke down. Peck told the officer nothing else in the truck belonged to him.

Soon after the officer was done talking with Peck, the homeowner arrived. She confirmed with the police officers that she did not know either Peck or Tellvik and that they did not have permission to be on her property. She also confirmed that her outbuilding, which was open, had been locked when she left. When asked about the battery and the bag of tools Peck claimed, the homeowner said they were

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

hers and that they had been stored in the outbuilding. The officers found a pry bar in the snow beneath the Dodge Dakota's driver's side door and it appeared from the latch and door of the outbuilding that it had been pried open. The officers accompanied the homeowner into the outbuilding and determined that somebody had been inside.

Peck and Tellvik were taken from the scene. Because the pickup was stolen and stuck on private property, the officers impounded the vehicle and called for a tow truck. Before the tow truck arrived, an officer conducted an inventory search. When asked at trial why he inventoried the vehicle, the officer testified:

> A: We want to make sure there's nothing inside that vehicle that the owner could be held responsible for if it's illegal. We don't want to return any drugs, any weapons, anything with that vehicle that shouldn't be in it. We want to go through the inside of the vehicle, make sure there's nothing unsafe, nothing illegal in there.
>
> Q: Okay. All right. So that's one--that's one purpose for it. And, what's another purpose for an inventory search?
>
> A: Another purpose, to inventory what items are in the vehicle. Another purpose also is if you get an occupied stolen to remove the property of the--occupants, so it's not returned to the owner of the vehicle.
>
> Q: Okay. And--when you want to make a list of the stuff, what -- what purpose does that serve?
>
> A: To show a list of what was in the vehicle.
>
> Q: Okay. And why would you--why would you care?
>
> A: Just in case someone claims that their diamond ring was left in that car and now it's gone.
>
> Q: Okay. So,--so who does it protect?

A: Everyone.

Q: And by everyone, it protects–the sheriff's office?

A: Sheriff's office, the registered owner, the other folks who have property inside that vehicle, their property isn't given away to someone it's not supposed to.

Q: And how about the tow company?

A: It also protects the tow company, yes.

Verbatim Transcript of Proceedings (VTP) (May 10, 2016) at 104-05. When asked if searching for something specific, the officer responded:

A: No. The main thing with one of these searches is to make sure you haven't got something dangerous that can go back to the owner. A good example is a case they had in Seattle recently where a stolen Jeep was returned to the owner, and it's full of used hypodermic needles. The last thing I want is to hop into my rig and reach down–seats and get–poked by somebody's (inaudible). And I'd feel the same way–any vehicle that we return to an owner.

*Id.* at 107. During the inventory search, the officer discovered that the ignition was punched out. The officer saw a "black zippered nylon case" that seemed to hold CDs (compact disks), and opened it. *Id.* at 418. When asked why he opened it, he responded, "No telling what could be in it." *Id.* at 108. And he further testified that "I didn't know if it belonged to the owner of the truck. It could very well have registration documents in it. It could have belonged to one of the subjects that were there that night." *Id.* at 109.

Inside the black zippered nylon case was packaged methamphetamine, an electronic scale, and a smoking pipe. The State charged Peck and Tellvik with

5

several crimes, including possession of a controlled substance with intent to deliver. Peck and Tellvik moved to suppress the contents of the black zippered nylon case. The trial court denied the motion to suppress, finding the inventory search to be proper and finding no evidence of pretext. *See id.* at 191-92 (oral CrR 3.6 ruling) ("I didn't see anything out of the ordinary here that would make me think that [the officer] was trying to use the inventory search to try to-bypass a warrant requirement."). Peck and Tellvik were subsequently convicted. Both appealed their controlled substance convictions. The Court of Appeals reversed the trial court's denial of the motion to suppress. We granted review.

## ANALYSIS

Peck and Tellvik challenge the proper scope of a warrantless inventory search, and the State challenges their ability to make such a claim. This case presents only questions of law, which we review de novo. *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009) (citing *State v. Carneh*, 153 Wn.2d 274, 281, 103 P.3d 743 (2004)).

## AUTOMATIC STANDING

First, we must decide whether the defendants have standing to challenge the search. The State argues Peck and Tellvik do not have standing because a thief should have no privacy interest that overrides that of the true owner. But in our

6

state, a defendant has automatic standing to challenge a search if (1) possession is an essential element of the charged offense and (2) the defendant was in possession of the contraband at the time of the contested search or seizure. *State v. Simpson*, 95 Wn.2d 170, 175, 622 P.2d 1199 (1980) (plurality opinion). And a defendant has automatic standing to challenge the legality of a seizure "'even though he or she could not technically have a privacy interest in such property.'" *State v. Evans*, 159 Wn.2d 402, 406-07, 150 P.3d 105 (2007) (quoting *Simpson*, 95 Wn.2d at 175).[2] The rule applies to searches as well as seizures. *See, e.g., State v. Allen*, 93 Wn.2d 170, 172-73, 606 P.2d 1235 (1980).

Peck and Tellvik have automatic standing to challenge the inventory search. The first prong of the test is satisfied because both were charged with possession of a controlled substance with intent to deliver. *See* RCW 69.50.401(1). The second prong is satisfied because Peck and Tellvik were in possession of the truck up until the time of the search. As such, Peck and Tellvik have automatic standing to challenge the warrantless inventory search of the black zippered nylon case. The dissent claims that we "eviscerate[] automatic standing." Dissent at 15. We do not. Peck and Tellvik have automatic standing to challenge the admission of evidence found during the inventory search. Because we find Peck and Tellvik

---

[2] In *Evans*, we held merely disclaiming ownership was not enough to constitute abandonment. We emphasized that the circumstances surrounding the disclaimer dictate whether a defendant has abandoned his or her property. 159 Wn.2d at 412-13.

have automatic standing to challenge the inventory search, we address the propriety of the search.

INVENTORY SEARCH

"Any analysis of article 1, section 7 in Washington begins with the proposition that warrantless searches are unreasonable per se." *State v. White*, 135 Wn.2d 761, 769, 958 P.2d 982 (1998) (citing *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996)). Despite the strict rule, a warrantless search is valid if one of the narrow exceptions to the warrant requirement applies. *Id.* The exceptions are "'carefully drawn and jealously guarded.'" *State v. Byrd*, 178 Wn.2d 611, 616, 310 P.3d 793 (2013) (quoting *State v. Bravo Ortega*, 177 Wn.2d 116, 122, 297 P.3d 57 (2013)).

One of those narrow exceptions is a noninvestigatory inventory search. Inventory searches have long been recognized as a practical necessity. *State v. Tyler*, 177 Wn.2d 690, 700-01, 302 P.3d 165 (2013) (citing *State v. Gluck*, 83 Wn.2d 424, 428, 518 P.2d 703 (1974)). To be valid, inventory searches must be conducted in good faith and not as a pretext for an investigatory search. *Id.* at 701 (citing *State v. Houser*, 95 Wn.2d 143, 155, 622 P.2d 1218 (1980)).

Inventory searches are also limited in both scope and purpose. As we held in *Tyler*, "Warrantless inventory searches are permissible because they (1) protect

the vehicle owner's (or occupants') property, (2) protect law enforcement agencies/officers and temporary storage bailees from false claims of theft, and (3) protect police officers and the public from potential danger." *Tyler*, 177 Wn.2d at 701 (citing *White*, 135 Wn.2d at 769-70).[3] "Unlike a probable cause search and search incident to arrest, officers conducting an inventory search perform an administrative or caretaking function." *State v. VanNess*, 186 Wn. App. 148, 162, 344 P.3d 713 (2015) (citing *State v. Smith*, 76 Wn. App. 9, 13, 882 P.2d 190 (1994)). Here, because we are not faced with a locked container, we do not opine on the propriety of law enforcement's opening of a locked container in the context of an inventory search. Peck and Tellvik argue there is no constitutional difference between a locked container and one that is merely closed. Resp't's Suppl. Br. (Tellvik) at 8 (citing *State v. Wisdom*, 187 Wn. App. 652, 675-76, 349 P.2d 953 (2015); *Houser*, 95 Wn.2d at 158; *White*, 135 Wn.2d at 771-72). Having examined the three cases cited, we disagree.

First, in *Houser*, the defendant was charged with two counts of possession of a controlled substance. *Houser*, 95 Wn.2d at 145. The charges were based on drugs found by police after impounding the defendant's vehicle. The police opened the locked trunk and searched a shopping bag, within which was a closed

---

[3] A "bailee" is "[s]omeone who receives personal property from another, and has possession of but not title to the property. A bailee is responsible for keeping the property safe until it is returned to the owner." BLACK'S LAW DICTIONARY 173 (11th ed. 2019).

toiletry bag that the police also opened and found drugs. *Id.* at 146-47.[4]

Contending that the evidence obtained during the inventory search should have

been suppressed by the trial court, the defendant challenged the propriety of the

impoundment as well as the scope of the search. We held (1) the impoundment

was unconstitutional, (2) opening the locked trunk in the course of an inventory

search was unconstitutional, and (3) opening the closed luggage within the locked

trunk was unconstitutional. *Houser*, 95 Wn.2d at 153-59.

The third holding is pertinent here: "where a closed piece of *luggage* in a

vehicle gives no indication of dangerous contents, an officer cannot search the

contents of the *luggage* in the course of an inventory search unless the owner

consents." *Houser*, 95 Wn.2d at 158 (emphasis added). When read in context, two

things are clear: (1) the *Houser* court, similar to the *Wisdom* court, relied heavily

on the personal and private nature of luggage and (2) based on the personal and

private nature of luggage, the court announced a rule regarding *only luggage*, not

all closed containers. Indeed, in coming to the holding, we framed the issue as

"the issue of whether the contents of unlocked *luggage* found within an automobile

may be examined in the course of an inventory search." *Houser*, 95 Wn.2d at 156-

57 (emphasis added). And to be sure, we emphasized the privacy interests in

---

[4] Suspecting the car may be stolen, law enforcement checked by radio and learned that it was not stolen. Although the defendant did not consent to the search, law enforcement opened the locked truck with a key they obtained from the defendant.

10

personal luggage by contrasting other types of closed containers and packages "e.g., a kit of burglar tools or a gun case," which do not implicate the same privacy interests. *Houser*, 95 Wn.2d at 157. Finally, the closed luggage was removed from the locked trunk of an unlawfully impounded vehicle, and the owner did not consent to the search of his luggage. Here, there was no closed *luggage*, and the closed nylon case was not found in the defendant's vehicle's locked trunk—it was found in the passenger compartment of a known stolen vehicle with shattered back windows and a punched-out, screwdriver-started ignition that was properly impounded. We did not announce a categorical rule against opening closed containers in the course of an inventory search, and given the vastly different facts, *Houser* does not control.[5]

Second, in *Wisdom*, the Court of Appeals focused on the intimate nature of the closed container in question before finding that "a zipped shaving kit bag found on the seat of a truck" should have been suppressed. *Wisdom*, 187 Wn. App. at 657. Relying on *Houser*, the court stated that "Washington courts recognize an

---

[5] The dissent would hold that *Houser* controls. To come to this conclusion, the dissent characterizes *Houser* as providing "that when there is no sign of danger, no authority of law exists to open a closed container during a warrantless inventory." Dissent at 34 (citing *Houser*, 95 Wn.2d at 156-59). We respectfully disagree with this characterization of *Houser* because it ignores the fact that the *Houser* court explicitly differentiated between luggage and other containers that do not deserve the same protection. *Houser*, 95 Wn.2d at 157-58. The *Houser* court based its rule on "the privacy of personal luggage" and "conclude[d] that where a closed piece of *luggage* in a vehicle gives no indication of dangerous contents, an officer cannot search the contents of the *luggage* in the course of an inventory search unless the owner consents." *Houser*, 95 Wn.2d at 158 (emphasis added).

11

individual's privacy interest in his closed *luggage*, whether locked or unlocked."

*Wisdom*, 187 Wn. App. at 670 (emphasis added) (citing *Houser*, 95 Wn.2d at 143).

The court focused on the privacy interest in a purse "because of the secrets

obtained therein" and likened rummaging through a purse to rummaging through a

shaving kit. *Id.* And finally, a "citizen places personal items in *luggage* in order to

transport the items in privacy and with dignity." *Id.* at 675 (emphasis added). The

*Wisdom* court, similar to the *Houser* court, placed great emphasis on the intimate

nature of the closed shaving kit bag—considerations that do not arise here.

And third, in *White*, we considered whether officers could lawfully open the

locked trunk of a vehicle during an inventory search. *White*, 135 Wn.2d at 763-64.

Specifically, we considered whether a trunk release mechanism diminished an

individual's privacy interest in a locked trunk. *Id.* at 767. We found it did not.

We restricted our holding to law enforcement's opening of the locked trunk and

explicitly declined to opine on the opening of a closed container found therein.

*White*, 135 Wn.2d at 772 ("We do not address the impound issue or the search of

the closed tackle box because the permissible scope of an article I, section 7

inventory search has been exceeded.").

We emphasized the significance of the trunk being locked, and held,

"Whether a locked trunk is opened by a key or a latch, it is still locked." *Id* at 767-

68. And therefore, "We hold the use of the trunk release mechanism in this case is

12

still the warrantless search of a locked trunk, which brings this case squarely under the [second] holding of *Houser*." *Id.*[6] But a locked trunk is not at issue here. As such, like *Houser*, *White* does not control. We reject Peck and Tellvik's attempt to treat the nylon case as a locked container.

Whether this was a proper inventory search turns, in part, on the context here. First, the police knew the vehicle was stolen. Second, Peck and Tellvik were arrested while in the process of burglarizing a home and were observed taking items from the home and its surroundings. Responding officers testified that a purpose in conducting an inventory search of the truck was to determine ownership of both the truck and its various contents. *See* VTP (May 10, 2016) at 104-05. Third, the search was not pretextual. And finally, the innocuous nature of the container at issue is important: a nylon case that looked like it contained CDs does not possess the same aura of privacy as a purse, shaving kit, or personal luggage. Under these circumstances, it was proper for police to do more than merely inventory the unlocked nylon case as a sealed unit.

---

[6] We respectfully disagree with the dissent's interpretation of *White*. The thrust of *White* is that the trunk was locked, and we said so no less than nine times. *See, e.g.,* 135 Wn.2d at 764, 766-68, 770-72. The dissent interprets "'[w]hether a key is needed to unlock the trunk or whether an interior release is used is of no distinction to the privacy interest of the individual under article I, section 7 of the Washington State Constitution'" to mean the trunk was "effectively unlocked." Dissent at 40 (quoting *White*, 135 Wn.2d at 771). Were the trunk "effectively unlocked," one would need neither a key nor an interior release. We decline to treat innocuous closed containers the same as locked trunks.

13

The first purpose of an inventory search is to protect the owner's property. *Tyler*, 177 Wn.2d at 701. It would undermine this purpose to require the case to be inventoried simply as a closed container. Here, there was no readily available way to know who the owner of the property was. The only people present at the time of the arrest were Peck and Tellvik, and Peck disclaimed ownership of most of the property inside the stolen vehicle. The property could belong to any number of people, including the stolen vehicle's owner, the owner of the burglarized home, or even Peck and Tellvik. In *Houser*, a case that did not involve a stolen vehicle, we deemed intrusion into a car's unlocked glove compartment "reasonable in light of the valid objectives of an inventory search because documents of ownership and registration are customarily stored in the glove compartment and it often serves as a place for the temporary storage of valuables." 95 Wn.2d at 155. Under these circumstances, neither logic nor experience illuminates a difference between an unlocked glove compartment and an unlocked nylon case.

The second purpose of an inventory search is to protect bailees from the true owners' claims that their property was damaged after it was taken into police custody. *Tyler*, 177 Wn.2d at 701. Under these circumstances—where it is clear the car was stolen and the ownership of its contents was unknown—a full accounting of the containers' contents is a reasonable way to safeguard bailees. Additionally, inventorying the contents protects the vehicle's owner from being

14

presented with drugs, guns, or property that simply does not belong to them when the stolen vehicle is returned. Perhaps most importantly, one of the officers testified that the container "could very well have registration documents in it." VTP (May 10, 2016) at 109.

For practical reasons, an inventory search of a vehicle known to be stolen is simply different from other inventory searches. *Cf. State v. Lynch*, 84 Wn. App. 467, 477-78, 929 P.2d 460 (1996) (quoting 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 7.4(e) at 568 (3d ed. 1996)). The totality of the circumstances reasonably informs the legitimate scope of the inventory. In such cases, there is a need to know who owns the vehicle and who owns its contents in order to do an adequate inventory. We conclude that under these circumstances, a proper inventory search of a stolen vehicle extends to opening unlocked, innocuous closed containers in order to determine ownership. We emphasize that this limited proper purpose cannot be used as a pretext for an investigatory search.[7] Our holding is limited to cases where the circumstances strongly indicate that ownership is unknown. Here, where the vehicle was stolen, Peck and Tellvik were arrested

---

[7] Additionally, based on Deputy Zach Green's testimony that the inventory search was done "[f]or the purpose of looking for evidence or anything else that was left in the vehicle," Peck argues that the search was pretextual. VTP (May 10, 2016) at 41. The trial court addressed pretext in its oral CrR 3.6 ruling and explicitly found none. *Id.* at 191-92. After thoroughly reviewing the record and considering Deputy Green's statement in the context of the case, we agree with the trial court's ruling. Similarly, Peck does not show he was prejudiced by the late filing of the court's written findings. Accordingly, no remand under RAP 13.7(b) is necessary.

immediately outside of a home that they were currently burglarizing, and the trial court explicitly found no evidence of pretext, the search was proper.[8]

## CONCLUSION

We hold that under the facts of this case, the search was a lawful inventory search. Accordingly, we reverse the Court of Appeals and uphold the denial of the motion to suppress.

---

[8] The dissent argues that "the majority justifies the warrantless inventory at issue here on the basis that it was necessary to look for evidence of the suspected burglary." Dissent at 31 n.14. We respectfully disagree with this characterization of our opinion. To allow the inventory search for the purpose of "look[ing] for evidence of the suspected burglary" would of course be outside the scope of a lawful inventory search, and any fruits would need to be suppressed. We emphasize the circumstances and facts of the case to illustrate that the officers could not know who the items in the stolen vehicle belonged to.

González, J.

WE CONCUR:

No. 96069-1
(Consolidated with No. 96073-9)

GORDON McCLOUD, J. (dissenting)—Are purses, briefcases, backpacks,

gym bags, diaper bags, pill boxes, CD (compact disk) holders, and other closed

containers subject to warrantless search when the police impound a person's

property? Our prior decisions compel us to answer no. Article I, section 7 of the

Washington Constitution protects the privacy of those items because they are the

people's "private affairs."

The majority comes to a different conclusion for two reasons: (1) although

it claims to adhere to our constitutionally compelled automatic standing rule, the

majority effectively holds that these defendants are not entitled to standing because

they were accused of stealing the truck containing the sealed container and (2)

although it claims to adhere to our prior decisions limiting the inventory exception

to the warrant requirement, the majority silently overrules our two controlling

1

cases—*White* and *Houser*[11]—barring the police from opening sealed containers

(absent evidence of danger) in this situation.

I cannot agree with the majority's approach. It conflicts with our distinct

method of article I, section 7 analysis by replacing it with Fourth Amendment

reasonableness analysis. U.S. CONST. amend. IV. And though the majority

purports to apply our automatic standing doctrine, it essentially eliminates it for

defendants accused of crimes with an element of illegal possession—the very

scenario that the automatic standing doctrine was designed to address. This dilutes

the article I, section 7 privacy protections to which Washingtonians are entitled.

I would follow—and reaffirm—our prior decisions that protect

Washingtonians' constitutional right to privacy. I therefore respectfully dissent.

FACTUAL AND PROCEDURAL HISTORY

I.      Law Enforcement's Response to a Reported Theft, the Discovery of a
        Stolen Vehicle, and the Warrantless Search

Corporal Zach Green and Deputy Dan Kivi, two Kittitas County sheriff's

deputies, responded to a suspected theft in progress at a home in rural Ellensburg.

*Peck* Verbatim Transcript of Proceedings (PRP) (May 10, 2016) at 23-24; *Tellvik*

---

[1] *State v. White*, 135 Wn.2d 761, 958 P.2d 982 (1998); *State v. Houser*, 95 Wn.2d 143, 622 P.2d 1218 (1980).

2

Verbatim Report of Proceedings (TRP) (May 10, 2016) at 73-74.[2] When the deputies arrived, they discovered two individuals outside the home, along with a pickup truck stuck in the driveway's unplowed snow. PRP (May 10, 2016) at 25-26, 161; TRP (May 10, 2016) at 75-76, 213. The deputies handcuffed the two men and eventually learned that they were Michael Peck and Clark Tellvik. PRP (May 10, 2016) at 166; TRP (May 10, 2016) at 219.

Two more deputies then arrived. One of them, Deputy Michael McKean, entered the pickup truck's license plate into a law-enforcement database and learned that the truck had been reported stolen. PRP (May 10, 2016) at 30; TRP

---

[2] The parties in these cases, including the State, cite the transcripts instead of the superior court's written findings of facts and conclusions of law. *See* CrR 3.6 (requiring written findings of facts and conclusions of law). Peck and Tellvik do so because the superior court did not enter the required findings until nearly 11 months after the suppression hearing and jury verdicts, and they contend that many of the late-filed findings were inconsistent with the court's oral ruling and not supported by substantial evidence. The State appears to have conceded that they are correct: it has not cited the written findings, either in this court or in the Court of Appeals. Although the parties dispute whether the inventory at issue was pretext for an investigative search, they do not dispute the facts that bear on whether the inventory, assuming it was just an inventory, was permissible under article I, section 7. I therefore join the parties in relying on the transcripts to address that question. I cite transcripts for both cases because each of the two defendants, despite having been tried together, has his own transcript of the proceedings and those transcripts have different pagination.

(May 10, 2016) at 80. Meanwhile, Deputy Kivi and the fourth deputy on the scene, Deputy Mark Rickey, gave *Miranda*[3] advisories to Peck and Tellvik.

Peck chose to speak with Corporal Green. PRP (May 10, 2016) at 30-31, 77-78; TRP (May 10, 2016) at 80-81, 129-30. Peck initially told Corporal Green that nothing in the truck belonged to him. PRP (May 10, 2016) at 37-38; TRP (May 10, 2016) at 87-88. However, he then clarified that actually, a cell phone in the cab and a battery and bag of tools in the bed belonged to him. PRP (May 10, 2016) at 37-38; TRP (May 10, 2016) at 87-88. "As far as the inside of the truck, other than his cell phone he told [Corporal Green] that nothing in that truck belonged to him." PRP (May 10, 2016) at 37-38; TRP (May 10, 2016) at 88. Deputy McKean, who would later inventory the truck, did not hear that statement, though. PRP (May 10, 2016) at 109; TRP (May 10, 2016) at 161.

Tellvik chose to speak to Deputy Rickey. PRP (May 10, 2016) at 77-82; TRP (May 10, 2016) at 128-33. Deputy Rickey did not ask him whether anything in the truck belonged to him. PRP (May 10, 2016) at 77-82; TRP (May 10, 2016) at 128-33.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

While Corporal Green and Deputy Rickey transported Peck and Tellvik to jail, Deputy Kivi and Deputy McKean stayed behind to deal with the truck. Because the truck was stuck in the snow and located on private property, the decision had been made to impound the vehicle. PRP (May 10, 2016) at 41-42; TRP (May 10, 2016) at 91-92.

While waiting for a tow truck to arrive, Deputy Kivi and Deputy McKean "[m]ethodically" searched the pickup. PRP (May 10, 2016) at 107; TRP (May 10, 2016) at 159. They did so without obtaining a warrant because, as they explained, they believed that Peck and Tellvik did not have a reasonable expectation of privacy in a stolen vehicle. PRP (May 10, 2016) at 42, 49, 115, 118; TRP (May 10, 2016) at 92, 100, 168, 171. But they did not attempt to obtain consent from the person who had reported the pickup truck stolen, either. PRP (May 10, 2016) at 61-62; TRP (May 10, 2016) at 113. According to the deputies, most owners of stolen vehicles are not troubled to learn that the police have searched their vehicle without permission. PRP (May 10, 2016) at 64, 118-19; TRP (May 10, 2016) at 116, 171.

During the search, Deputy McKean discovered a black zippered nylon case "partially wedged under the [passenger-side] seat." PRP (May 10, 2016) at 108; TRP (May 10, 2016) at 160-61. From the outside, the case looked like a CD case.

5

PRP (May 10, 2016) at 108; TRP (May 10, 2016) at 161. Deputy McKean, who still had not obtained a warrant and still did not know that Peck had implicitly disclaimed ownership of the items inside the vehicle, opened the case. PRP (May 10, 2016) at 109, 115; TRP (May 10, 2016) at 161, 168. He discovered methamphetamine and drug paraphernalia inside. PRP (May 10, 2016) at 109-10; TRP (May 10, 2016) at 162.

II.     Proceedings in the Superior Court

The State charged Peck and Tellvik with several crimes, including possession of a stolen vehicle and possession of a controlled substance with intent to deliver. *Peck* Clerk's Papers (PCP) at 212-14 (Second Amended Information); *Tellvik* Clerk's Papers (TCP) at 219-21 (same); *see also* RCW 9A.56.068 (criminalizing possession of a stolen vehicle); RCW 69.50.401 (criminalizing possession of a controlled substance with intent to deliver).[4]

---

[4] The other crimes that the State charged Peck and Tellvik with were burglary in the first degree, theft in the third degree, and making or having burglary tools. PCP at 212-14; TCP at 219-21. Additionally, the State charged Tellvik with possession of a stolen firearm and unlawful possession of a firearm in the second degree. PCP at 212-14; TCP at 219-21. The jury acquitted the men of theft in the third degree and found them guilty of the remaining charges. PRP (May 13, 2016) at 863-68; TRP (May 13, 2016) at 897-902; *see also* PCP at 228 (judgment and sentence); TCP at 252 (judgment and sentence).

Peck and Tellvik moved to suppress the contents of the black zippered nylon

case. PCP at 19-25 (motion); TCP at 60-62 (motion). They made two arguments.

First, they argued that absent exigent circumstances, a police officer or sheriff's

deputy conducts an unlawful search under article I, section 7 by opening a closed

container during a warrantless inventory. Second, they argued that the warrantless

inventory that deputies McKean and Kivi conducted was pretext for an

investigatory search. PRP (May 10, 2016) at 180-84, 189-90; TRP (May 10, 2016)

at 232-36, 240-41.

The State argued that "[w]here the officer tried to find out specifically what

items belonged to the defendant, and where the defendant disavows knowledge of

the item in question, the defendant should not be allowed to later assert standing to

object to the inventory search of the item." PCP at 49-50 (response). Additionally,

the State maintained that opening the black zippered nylon case was neither

pretextual nor outside the scope of a permissible inventory. *Id.* at 49-52; *see also*

PRP (May 10, 2016) at 184-89; TRP (May 10, 2016) at 236-40.

The superior court held one evidentiary hearing on the motions and issued

an oral ruling denying them. PRP (May 10, 2016) at 190-92; TRP (May 10, 2016)

at 241-43. The court did not address standing. But it did expressly hold that an

7

officer conducting a warrantless inventory has authority to open a closed container and that in these cases, the inventory was not pretextual.

A jury subsequently convicted each defendant of the charged drug possession and stolen vehicle offenses. PRP (May 13, 2016) at 863-68; TRP (May 13, 2016) at 897-902; *see also* PCP at 228 (judgment and sentence); TCP at 252 (judgment and sentence).

III.   The Appeals

Peck and Tellvik appealed the drug convictions. Each assigned error to the denial of the motion to suppress, arguing that opening the black zippered nylon case exceeded the scope of a permissible inventory under article I, section 7. Appellant's Br. (*Peck*) at 1, 23-26 (Wash. Ct. App. No 34496-7-III (2017)); Appellant's Opening Br. (*Tellvik*) at 1, 9-14 (Wash. Ct. App. No 34525-4-III (2017)). Each also argued that denial of the motion was improper because the warrantless inventory was pretextual. Appellant's Br. (*Peck*) at 1, 21-23 (Wash. Ct. App. No 34496-7-III (2017)); Am. Suppl. Appellant's Br. (*Tellvik*) at 1-7 (Wash. Ct. App. No 34525-4-III (2017)).

In separate decisions, the Court of Appeals reversed Peck and Tellvik's convictions for possession of a controlled substance with intent to deliver. *State v. Peck*, No. 34496-7-III (Wash. Ct. App. May 8, 2018) (unpublished),

8

https://www.courts.wa.gov/opinions/pdf/344967_unp.pdf; *State v. Tellvik,*
No. 34525-4-III (Wash. Ct. App. June 14, 2018) (unpublished),
https://www.courts.wa.gov/opinions/pdf/345254_unp.pdf. That court held that
when "officers conducting an inventory search encounter a locked compartment or
closed container, it cannot be opened absent exigent circumstances or the consent
of the owner." *Peck*, slip op. at 8 (citing *State v. Wisdom*, 187 Wn. App. 652, 675-
76, 349 P.3d 953 (2015); *Houser*, 95 Wn.2d at 158; *White*, 135 Wn.2d at 771-72);
*see also Tellvik*, slip op. at 5. The deputies in these cases should have
"inventor[ied] the container as a sealed unit." *Peck*, slip op. at 8; *see also Tellvik*,
slip op. at 5.

Because the Court of Appeals reversed on the basis that opening the black
zippered nylon case without a warrant exceeded the scope of a permissible
inventory, it did not reach the fact-dependent issue of whether the inventory was
pretextual.

In *Peck*, Judge Korsmo dissented. In his view:

> There is nothing reasonable in allowing a passenger in a stolen vehicle
> to challenge the scope of an inventory search conducted by police
> with the intent to ascertain what property they have just taken into
> their possession and to whom it might be returned. That is
> particularly the case where, as here, the person asserting the privacy
> right expressly disclaimed ownership of the item searched. One
> cannot both assert that an item is not his and still claim that the item is
> his "private affair."

*Peck,* slip op. at 1 (Korsmo, J., dissenting) (quoting WASH. CONST. art. I, § 7). The

dissent justified the search of the zippered case because it "could have contained an

explosive or the Hope Diamond." *Id.*

The dissent also incorporated by reference the dissenting opinion in

*Wisdom.*[5] That case presented a similar issue, and the same dissenting judge there

opined, "A thief does not have a privacy interest in stolen property . . . and, thus,

. . . [has] no standing to contest the inventory search." *Wisdom,* 187 Wn. App. at

679 (Korsmo, J., dissenting). "But, even if there [were] standing, the officer could

look through an unlocked [container] left on the front seat of the stolen truck." *Id.*

According to that dissent, "[i]t defeats the very purpose of an inventory search—to

list and secure property, as well as protecting law enforcement from false claims—

to make the police ignore a valuable item in plain sight and act without knowledge

of what was in their possession." *Id.* at 683. He therefore concluded that "police

have the right during an inventory to check the entire contents of a bag when

valuable property is visible." *Id.* at 684.

---

[5] The State did not seek review of *Wisdom,* even though it was a split, published
decision.

10

The State moved for reconsideration in *Peck*. It acknowledged that Peck had

standing to challenge the scope of the warrantless inventory. Resp't's Mot. to

Reconsider Court's Ruling of May 8, 2018 (*Peck*) at 4 (Wash. Ct. App. No 34496-

7-III (2018)) (*Peck* Mot. to Reconsider). Reconsideration was nonetheless merited

in the State's view because the "decision places law enforcement in a catch-22 in

which they can neither inventory an innocuous item within a stolen vehicle, nor

obtain a warrant for that same innocuous item." *Id.* at 6. The Court of Appeals

denied the motion.

Judge Korsmo did not sit on the *Tellvik* panel, and the decision in that case

was unanimous. The State did not move for reconsideration in *Tellvik*.

This court granted the State's petitions for review and consolidated the

cases. *State v. Peck*, 191 Wn.2d 1018, 428 P.3d 1174 (2018).

ANALYSIS

I.     Article I, Section 7 Protects Washingtonians' Privacy

The questions in these cases are (1) whether Peck and Tellvik had standing

to challenge Deputies McKean and Kivi's warrantless search of the pickup truck,

including Deputy McKean's examination of the contents inside the black zippered

nylon case and (2) whether Deputy McKean's opening the black zippered nylon

case and examining its contents without a warrant exceeded the scope of a

11

permissible inventory under article I, section 7. An overview of our state constitution's explicit privacy protections is helpful to place these questions in context.

Article I, section 7 is part of the Washington Constitution's declaration of individual rights. It guarantees that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. We have repeatedly recognized that these "privacy protections . . . are more extensive than those provided under the Fourth Amendment." *State v. Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009) (citing cases). Unlike the Fourth Amendment and its focus on reasonableness, *see* U.S. CONST. amend. IV, our state constitution "'clearly recognizes an individual's right to privacy with no express limitations.'" *State v. Hinton*, 179 Wn.2d 862, 868, 319 P.3d 9 (2014) (internal quotation marks omitted) (quoting *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994)).

Accordingly, when the criminally accused contends that the State obtained evidence in violation of article I, section 7, we undertake a two-part inquiry.

> "First, we must determine whether the state action constitutes a disturbance of one's private affairs. . . . Second, if a privacy interest has been disturbed, the second step in our analysis asks whether authority of law justifies the intrusion. The 'authority of law' required by article I, section 7 is satisfied by a valid warrant, limited to a few jealously guarded exceptions."

*Valdez*, 167 Wn.2d at 772 (alteration in original) (quoting *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 306, 178 P.3d 995 (2008) (plurality opinion)). If the State violated article I, section 7, we suppress the illegally obtained evidence. *State v. Winterstein*, 167 Wn.2d 620, 631-32, 220 P.3d 1226 (2009). Failure to follow this "constitutionally mandated exclusionary rule" would gut article I, section 7, effectively rendering the private affairs of all Washingtonians public. *Id.* at 632.

With that background, I now turn to the defendants' article I, section 7 claims in these cases.

## II. Peck and Tellvik Have Standing To Challenge the Legality of the Sheriff's Deputy's Opening the Black Zippered Nylon Case

### A. Automatic Standing Has Been the Law of Washington for Almost 40 Years

Although the State acknowledged to the Court of Appeals that Peck and Tellvik had standing to challenge the warrantless inventory of the truck, *see Peck* Mot. to Reconsider at 4, the State nonetheless now contends that the Court of Appeals erred in reviewing the merits of Peck and Tellvik's claim.[6] Pet'r's Resp.

---

[6] The State did not clearly change its position on Peck and Tellvik's standing until it filed its response to amici in this court. Thus, Peck and Tellvik have not had an

13

to Amicus Curiae Brs. of WACDL [Washington Association of Criminal Defense

Lawyers] & ACLU [American Civil Liberties Union of Washington] at 3-5 (Resp.

to Amici). It asserts that the two lacked standing to challenge the warrantless

inventory because the truck had been reported stolen and Peck implicitly denied

ownership of the black zippered nylon case to Corporal Green.

The majority essentially takes the same approach. It does purport to hold

that Peck and Tellvik have standing. Majority at 6-8. But it severely undermines

that conclusion by failing to treat Peck and Tellvik as standing in the shoes of the

true owner of the pickup truck and black zippered nylon case, as our cases require.

---

opportunity to respond directly to the State's about-face. The pivot between flatly contradictory positions nonetheless calls to mind the equitable doctrine of judicial estoppel. That doctrine permits a court to bar a party from unfairly benefiting from shifting contradictory positions during continuing litigation. *See, e.g., Cunningham v. Reliable Concrete Pumping, Inc.*, 126 Wn. App. 222, 224-25, 108 P.3d 147 (2005) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position."). The bar on asserting contradictory positions also applies in criminal cases and is supported by additional, nondiscretionary rules. *See State v. Roberts*, 142 Wn.2d 471, 498, 14 P.3d 713 (2000) ("Remarkably, the State adheres to this position in Cronin's appeal of his conviction to this court, while taking the opposite position in Roberts' appeal. The State must have believed Cronin's statements were true, or the State committed ethical and constitutional violations by introducing the testimony in Cronin's appeal. [Rules of Professional Conduct (RPC) 3.3, 3.4]; *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000)." (citations omitted)). Because I would recognize Peck and Tellvik's standing to make their article I, section 7 claim, I need not consider whether the State must be equitably estopped from contesting standing.

*State v. Simpson*, 95 Wn.2d 170, 188, 622 P.2d 1199 (1980) (plurality opinion). It does so by relying heavily on the fact that the truck had been reported stolen and that Peck implicitly disclaimed ownership of the zippered case to justify Deputy McKean's decision to unzip and open the case. Majority at 2, 11, 13-16. This is incorrect. As the discussion below explains, once the automatic standing test is satisfied, the party challenging the search is treated as the true owner of the searched property for the purpose of the motion to suppress. By treating Peck and Tellvik as vehicle thieves and strangers to the property, even though they stand in the shoes of the vehicle owner and case owner for purposes of the motion to suppress, the majority eviscerates automatic standing as much as the State.

This conflicts with our binding precedent. "In Washington, a defendant has '"automatic standing"' to challenge the legality of a seizure 'even though he or she could not technically have a privacy interest in such property.'" *State v. Evans*, 159 Wn.2d 402, 406-07, 150 P.3d 105 (2007) (quoting *Simpson*, 95 Wn.2d at 175). Such a defendant also has automatic standing to challenge the legality of a search. *See, e.g., State v. Allen*, 93 Wn.2d 170, 172-73, 606 P.2d 1235 (1980). This rule exists to protect the constitutional rights of criminal defendants while promoting integrity in the State's execution of its prosecutions. As the lead opinion in *Simpson* explained,

> [T]he automatic standing rule was originally created to effectuate two
> separate policy judgments: (1) The doctrine was said to ensure that
> the State will not assume contradictory positions by arguing in the
> suppression hearing that the defendant did not have possession of the
> property and therefore lacked any . . . privacy interests, and then
> arguing at trial that the defendant was guilty of unlawful possession of
> the property. . . . (2) The principle was established to ensure in
> addition that a defendant claiming possession in order to acquire
> standing in the suppression hearing would not have this evidence used
> against him at trial on the issue of possession.

95 Wn.2d at 175-76 (citing *Jones v. United States*, 362 U.S. 257, 261-64, 80 S. Ct.

725, 4 L. Ed. 2d 697 (1960), *overruled by United States v. Salvucci*, 448 U.S. 83,

100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)).

Thus, under article I, section 7, "a defendant has 'automatic standing' to

challenge a search . . . if: (1) the offense with which he is charged involves

possession as an 'essential' element of the offense; and (2) the defendant was in

possession of the contraband at the time of the contested search or seizure." *Id.*

at 181 (citing *State v. Michaels*, 60 Wn.2d 638, 646-47, 374 P.2d 989 (1962)).

This court has repeatedly applied this rule, *see Evans*, 159 Wn.2d at 407; *State v.*

*Jones*, 146 Wn.2d 328, 335, 45 P.3d 1062 (2002); *State v. Carter*, 127 Wn.2d 836,

850, 904 P.2d 290 (1995); *Allen*, 93 Wn.2d at 172; *Michaels*, 60 Wn.2d at 646-47,

including, in particular, to a warrantless search of a stolen vehicle, *see Simpson*,

95 Wn.2d at 181-82.

16

Although the United States Supreme Court has discarded the automatic

standing rule, we have retained it. *Id.* at 176-77, 180. We have even recognized a

third rationale underlying the rule: protecting the private affairs of all

Washingtonians. *Id.* at 180. That is, we decline to accept the federal rule because

it "allows the invasion of a constitutionally protected interest to be insulated from

judicial scrutiny by a technical rule of 'standing'. The inability to assert such an

interest threatens all of Washington's citizens, since no other means of deterring

illegal searches and seizures is readily available." *Id.*; *see also Winterstein*,

167 Wn.2d at 629-30 (developing rule under article I, section 7 to protect privacy

interests of third parties).

> B.     Peck and Tellvik Satisfy the Two Prerequisites to Automatic
>        Standing: They Were Charged with a Possessory Offense, and
>        They Possessed the Contraband at the Time of the Search

Peck and Tellvik therefore have standing to challenge the warrantless

inventory under the automatic standing rule. The State charged each man with

possession of a controlled substance with intent to deliver, an element of which is

possession. RCW 69.50.401(1); *State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502

(1994). That satisfies the first prong of the test. Peck and Tellvik were in

possession of the truck, which contained the black zippered nylon case, up to the

time of the arrest and warrantless search. This satisfies the second prong of the automatic standing test. *Jones*, 146 Wn.2d at 331-35.

      C.    The Majority's and the State's Assertions to the Contrary Fail

The State disagrees because the black zippered nylon case was inside a vehicle that had been reported stolen. The majority cites the same fact as a basis for legitimizing the search. Majority at 11, 14-16. This approach completely erodes the automatic standing rule by making it inapplicable to defendants charged with possessing stolen items. But that is precisely when the automatic standing rule applies—when one is charged with a possessory offense. *Simpson*, 95 Wn.2d at 181. So the fact that the truck was reported stolen supports, not undermines, Peck and Tellvik's automatic standing to challenge the warrantless search.

This is neither new nor surprising. In *Simpson*, our leading decision on the automatic standing rule, we expressly held that a defendant had standing to challenge a warrantless search of a vehicle that had been reported stolen. *Id.* at 181-82; *see also Evans*, 159 Wn.2d at 406-07 (recognizing *Simpson*'s plurality opinion as good law); *Jones*, 146 Wn.2d at 332 (same). And we have also held that a defendant's disclaimer of ownership of the searched item does not divest that

18

defendant of standing to challenge the search.[7] *Allen*, 93 Wn.2d at 172-73. Those

decisions foreclose the State's argument that Peck and Tellvik lack standing to

challenge its warrantless search.[8]

The State implies that we should overrule *Simpson* and its progeny as

incorrect and harmful.[9] It relies heavily on the dissent below, which directly

questioned the propriety of the automatic standing rule. The dissent argued, "One

---

[7] Even if Peck's implicit disclaimer of ownership could divest him of standing, it would not divest Tellvik of standing. Tellvik never disclaimed ownership. *Cf. State v. Morse*, 156 Wn.2d 1, 13, 123 P.3d 832 (2005) (explaining that one person does not speak for another when both are present and both have equal right of control of the property).

[8] The State also suggests that Peck and Tellvik lack standing because they abandoned the black zippered nylon case. *Peck* Corrected Pet. for Discr. Review at 9-10; *Tellvik* State's Pet. for Discr. Review at 9-10. This court has held that a defendant cannot challenge the constitutionality of a search of property that the defendant has voluntarily abandoned. *See State v. Reynolds*, 144 Wn.2d 282, 287-88, 27 P.3d 200 (2001). But abandonment is a fact-driven theory. *Id.* at 290-91 (recognizing the State's "burden of showing that the property was abandoned"); *Evans*, 159 Wn.2d at 408 ("Voluntary abandonment is an ultimate fact or conclusion based generally upon a combination of act and intent." (citing 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.6(b) at 574 (3d ed. 1996))); *State v. Samalia*, 186 Wn.2d 262, 276, 375 P.3d 1082 (2016) ("As a factual determination, we review a trial court's finding of voluntary abandonment for substantial evidence." (citing *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003))). And the State failed to develop the factual basis for its abandonment theory in the superior court, instead raising the theory for the first time in this court. *See Peck*, slip op. at 9 n.3 (majority) (noting that the State had not raised abandonment). The State's suggestion that Peck and Tellvik lack standing due to abandonment therefore fails.

[9] Ordinarily, we require parties to expressly assert that our prior decisions are incorrect and harmful before we will overrule any of them. *State v. Johnson*, 188 Wn.2d 742, 757, 399 P.3d 507 (2017) (citing *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008); *State v. Barber*, 170 Wn.2d 854, 864, 248 P.3d 494 (2011)).

cannot both assert that an item is not his and still claim that the item is his 'private affair.'" *Peck*, slip op. at 1 (Korsmo, J., dissenting) (quoting WASH. CONST. art. I, § 7).

But that is the essence of the automatic standing rule. It permits the defendant to assert contradictory positions because the alternative—permitting the State to do so—is untenable. To borrow the dissent's phrasing, without the automatic standing rule, the State would be allowed both to assert that an item *is the defendant's* for purposes of criminal liability *and* that the item *is not the defendant's* for purposes of article I, section 7.

And yet, that is exactly the position that the State advanced in the superior court here. On the one hand, the State alleged in its charging document that Peck and Tellvik possessed the methamphetamine and paraphernalia within the zippered case, thereby asserting that Peck's implied disclaimer of ownership and possession of the case was false. PCP at 213 (Second Amended Information); TCP at 220 (same). It also advanced that assertion at trial when it sought to prove that Peck and Tellvik possessed the case. But the State also sought to hold Peck and Tellvik to Peck's tacit disclaimer of ownership, treating it as true and binding, when the State contested their standing at the suppression hearing. In adopting the automatic standing rule, this court has already resolved that a defendant's constitutional

rights permit the defendant to maintain that contradiction—but that the State's responsibility to pursue convictions with integrity bar it from advancing such a contradiction. *Simpson*, 95 Wn.2d at 175-76.

The State's position also disregards the benefit to the public that the automatic standing rule provides. Regardless of who owns the black zippered nylon case, its contents are the private affairs of *somebody*.[10] And if the police conducted their warrantless search of the case without authority of law, that person's private affairs have been disturbed in violation of article I, section 7. Under the automatic standing rule, Peck and Tellvik "stand[] in the shoes" of that person. *Id.* at 182, 187. Their ability to challenge the warrantless search from that person's shoes helps protect "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant" by ensuring that the State cannot benefit from violating the constitutional rights of its citizens. *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984).

---

[10] The State's point that the black zippered nylon case was in "a surreptitious location where it was not readily observable and might have been placed there by the vehicle owner" reinforces this observation. Second Amended Resp't's Br. (*Peck*) at 22 (Wash. Ct. App. No. 34496-7-III (2018)); *see also* Resp't's Br. (*Tellvik*) at 14 (Wash. Ct. App. No. 34525-4-III (2018)) (making a similar point).

21

The State argues, however, that the true owner's interest in protecting their

property overrides that owner's privacy interests as a matter of law. It points to the

dissent in *Wisdom* which stated:

> [O]ne reason for an inventory search is to protect a vehicle owner's
> property. I would hold that a thief has no privacy interest that
> overrides that of the true owner. An inventory search to protect and
> recover the true owner's property should not be constrained by a
> thief's assertions concerning which of the contents are his and which
> are not.

187 Wn. App. at 680 (Korsmo, J., dissenting) (citation omitted); *see* Resp. to

Amici at 4; *Peck* Corrected Pet. for Discr. Review at 10; *Tellvik* State's Pet. for

Discr. Review at 10; *see also* PCP at 50 ("The inventory search conducted here did

not disturb Mr. Peck's private affairs. It was conducted to protect the vehicle

owner's interests and *his* private affairs."); PRP (May 10, 2016) at 185 (arguing

that "most people would want the police to have looked"); TRP (May 10, 2016) at

237 (same). But that is just another way of doing away with the automatic

standing doctrine by declining to treat the party challenging the search as standing

in the shoes of the true owner.

Even if we were to overrule our automatic standing decisions, per the State's

implicit invitation, and distinguish between the interests of the true owner and the

party challenging the search, as the majority does, we cannot presume that the true

owner would consent to a disturbance of their private affairs. Notwithstanding the

22

sheriff's deputies' testimony that vehicle owners generally express post hoc approval of their warrantless searches, our decisions consistently stress the owner's constitutional right not to consent. *See, e.g., State v. Morse,* 156 Wn.2d 1, 13, 123 P.3d 832 (2005) ("We have been quite explicit that under our state constitution, the burden is on the police to obtain consent from a person whose property they seek to search."); *State v. Hendrickson,* 129 Wn.2d 61, 71-72, 917 P.2d 563 (1996) (holding that previously provided consent did not continue into new situation); *cf. State v. Ferrier,* 136 Wn.2d 103, 118, 960 P.2d 927 (1998) (stating that "the waiver of the right to require production of a warrant must, in the final analysis, be the product of an informed decision"). Article I, section 7 thus requires that we presume that an owner has not consented to a disturbance of their private affairs.[11]

Given that Washington's automatic standing rule empowers Peck and Tellvik to challenge the warrantless search of the black zippered nylon case, this court should reach the issue of whether that search complied with article I, section 7 and apply the same analysis to the defendants' claim that their privacy

---

[11] Additionally, the premise of the State's argument—that opening a closed container is necessary to safeguard its contents—may not be correct. The police may secure property without opening it. *See Houser,* 95 Wn.2d at 159 (observing that a knapsack can be "'locked up as a whole in police headquarters [without being] opened and [without] its contents [being] removed, reshuffled and replaced'" (quoting *United States v. Bloomfield,* 594 F.2d 1200, 1202 (8th Cir. 1979))).

23

was violated as it would apply to a nondefendant owner's claim their rights were violated.

### III. The Sheriff's Deputy Violated Peck and Tellvik's Article I, Section 7 Rights When He Opened the Black Zippered Nylon Case

As noted, article I, section 7 claims require a two-part inquiry.

> "First, we must determine whether the state action constitutes a disturbance of one's private affairs. . . . Second, if a privacy interest has been disturbed, the second step in our analysis asks whether authority of law justifies the intrusion. The 'authority of law' required by article I, section 7 is satisfied by a valid warrant, limited to a few jealously guarded exceptions."

*Valdez*, 167 Wn.2d at 772 (alteration in original) (quoting *York*, 163 Wn.2d at 306).

### A. The Sheriff's Deputy Disturbed Peck and Tellvik's Private Affairs When He Opened the Black Zippered Nylon Case

"'First, we must determine whether the state action constitutes a disturbance of one's private affairs.'" *Id.* (quoting *York*, 163 Wn.2d at 306). This inquiry is different from the Fourth Amendment's reasonable expectation of privacy test. *See Katz v. United States*, 389 U.S. 347, 360, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). Article I, section 7 broadly protects "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *Myrick*, 102 Wn.2d at 511. "To determine whether governmental conduct intrudes on a private affair, we look at

24

the 'nature and extent of the information which may be obtained as a result of the government conduct' and at the historical treatment of the interest asserted."
*Hinton*, 179 Wn.2d at 869 (quoting *State v. Miles*, 160 Wn.2d 236, 244, 156 P.3d 864 (2007)).

Here, an agent of the State, Deputy McKean, opened a closed container, the black zippered nylon case. That action, according to the State, did not disturb Peck and Tellvik's private affairs because the black zippered nylon case resembled a CD case and therefore lacked an "aura of intimacy or privacy." *Peck* Corrected Pet. for Discr. Review at 9; *Tellvik* State's Pet. for Discr. Review at 9. By contrast, the State argues, the shaving kit searched in *Wisdom*—which the Court of Appeals in that case equated to *Houser*'s toiletry kit—had such an aura. *See* 187 Wn. App. at 670.

The State's argument that the contents of a closed CD case are not private affairs fails. As amicus curiae points out:

> The contents of a CD case can reveal information about the owner's religious beliefs, cultural heritage, political affiliations, mental health, and sexual preferences. For example, an opened CD case may reveal CDs containing religious scripture, foreign music, political speech, self-help programs or erotica, with information and images describing the CDs' contents printed on the face of the CDs.

Br. of WACDL as Amicus Curiae at 13. Such intimate information unquestionably constitutes one's "private affairs." WASH. CONST. art. I, § 7; *see*

25

*Miles*, 160 Wn.2d at 246-47 (holding that bank records are private affairs because "[t]hey can disclose what political, recreational, and religious organizations a citizen supports [and] potentially disclose where the citizen travels, their affiliations, reading materials, television viewing habits, financial condition, and more"); *see also Hinton*, 179 Wn.2d at 869-77 (discussing privacy interests protected by article I, section 7).

The fact that the zippered case turned out not to be a CD case at all further undermines the State's argument. The State's evidence at trial revealed that the case was in reality quite similar to a toiletry kit or shaving kit. *See* Ex. 19. (photograph depicting built-in mesh pouches inside of the black zippered nylon case). It could easily have contained "prescription drugs, condoms, or other items the owner wishes shielded from the public." *Wisdom*, 187 Wn. App. at 670. In other words, the case was "luggage," which, as the majority emphasizes, constitutes an individual's private affairs. *See* majority at 10-13 & n.5; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1344 (1993) (stating that "luggage" refers to "something that is lugged," especially "the belongings that a traveler carries with him," as well as "suitcases, traveling bags, and other articles containing a traveler's belongings"). After all, Peck and Tellvik "carrie[d]," or "lugged," the black zippered nylon case, a "something" "containing [their]

belongings," with them to Ellensburg in the stolen truck. The majority's assertion to the contrary is incorrect. *See* majority at 11.

Moreover, because the case was zipped up, the sheriff's deputy and the general public could not have known what the case contained: its contents were private. Although article I, section 7 does not "require individuals to veil their affairs in secrecy" for those affairs to be private and constitutionally protected, the contents of the black zippered nylon case *were* completely and perfectly veiled from public view. *Hinton*, 179 Wn.2d at 874. The contents were therefore "private affairs" to which article I, section 7's protection attached. WASH. CONST. art. I, § 7.

The majority fuzzes over this first step by placing analysis of the privacy interest at stake into the second step of the analysis—whether Deputy McKean acted with authority of law. That approach contains two errors.

First, that approach suggests that the owner or possessor of a closed container has no privacy interest in its contents. *See* majority at 13 (stating that "a nylon case that looked like it contained CDs does not possess the same aura of privacy as a purse, shaving kit, or personal luggage"); *see also id.* at 11 n.5, 13 n.6. I understand this to be an argument that the contents of a closed container are private only when the container obviously contains tampons, underpants, or

27

something else with an intimate body association. The problem with that position is that the privacy right under article I, section 7 protects more than just bodily privacy—it protects a wide array of information and affairs, including details about our various "'familial, political, professional, religious, and sexual associations.'" *Hinton*, 179 Wn.2d at 869 (quoting *United States v. Jones*, 565 U.S. 400, 415, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (Sotomayor, J., concurring)); *see also Miles*, 160 Wn.2d at 246-47. And as I noted above, "This court has consistently declined to require individuals to veil their affairs in secrecy" to obtain article I, section 7's protection. *Hinton*, 179 Wn.2d at 874. So while the majority speaks of "auras" of privacy, the upshot of its analysis is that any boring container could now be subject to police inspection.[12]

The second problem with the majority's approach is that it incorporates Fourth Amendment reasonableness balancing into article I, section 7 law. Instead of distinctly determining whether Peck and Tellvik have a privacy interest in the black zippered nylon case, the majority skips that step, assesses the strength of the asserted privacy interest in the context of the authority of law question, and balances that interest against law enforcement's asserted need to locate identifying

---

[12] The majority's position will also create headaches for the lower courts, which will have to ask, "Is this closed container more like a shaving kit or a CD case?"

28

documents and concealed valuables. Majority at 13-16. But there is no balancing under article I, section 7. Article I, section 7 "not only prohibits unreasonable searches, but also provides no quarter for ones that, in the context of the Fourth Amendment, would be deemed reasonable searches and thus constitutional." *Valdez*, 167 Wn.2d at 772; *see also State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) ("[W]hile the Fourth Amendment operates on a downward ratcheting mechanism of diminishing expectations of privacy, article I, section 7[] holds the line by pegging the constitutional standard" to Washingtonians' privacy interests.). In other words, a person's affairs are either private or they are not.[13] And if they

---

[13] Because affairs are either private or not, there is no difference in article I, section 7's protection based on the asserted magnitude of that privacy interest. All private affairs are protected. Thus, while a container's status as closed and locked or closed but not locked could potentially bear on whether the contents of the container are private affairs, *Simpson*, 95 Wn.2d at 188 n.6, article I, section 7's protection applies equally to all contents deemed private—locked or unlocked, *cf. State v. Counts*, 99 Wn.2d 54, 61-63, 659 P.2d 1087 (1983) (recognizing that warrantless entry into an unlocked home violates the Fourth Amendment). The majority's point to the contrary is incorrect. *See* majority at 9. As amicus curiae explains:

> Careful consideration of the properties of closed and locked containers shows that closure is the most significant aspect from a privacy standpoint, with locking much less significant. An open container means that the contents are available for any passerby to see, whether that person intends to pry or not. If one wishes to make an item private, the first and most significant step is simply to remove that item from public view. When an item is in a closed container, it is no longer susceptible to

are private, the State must obtain a warrant or act within the scope of an

established exception to the warrant requirement. The majority abandons this

concept—the single-most distinguishing feature of article I, section 7—by

balancing the privacy interests in the black zippered nylon case against law

enforcement's interests in conducting a search.

Keeping with article I, section 7, I would hold that opening the black

zippered nylon container disturbed Peck and Tellvik's private affairs.

> B.     The Sheriff's Deputy Lacked Authority of Law To Disturb
>         Peck and Tellvik's Private Affairs

"'[T]he second step in our analysis asks whether authority of law justifies

the intrusion.'" *Valdez*, 167 Wn.2d at 772 (quoting *York*, 163 Wn.2d at 306).

---

accidental viewing. Its privacy can only be breached by a deliberate act, the
opening of the container. . . .

> Locking a container, in contrast, is a mere quantitative change,
> increasing only the difficulty of opening the container. For that matter,
> locks come in all varieties; some are extremely difficult to open, while
> others can be defeated with the slightest of effort. It is hard to see a
> fundamental difference between using a knotted string, a zipper or a
> childproof cap to close a container and using a lock that can easily be
> opened with a paper clip or pocket knife; all require roughly the same
> amount of effort and deliberation to open.

Br. of Amicus Curiae ACLU at 7-8. "Again, it is the closure that makes the qualitative
change in privacy, and 'locking' simply increases the practical difficulty of successfully
breaching the privacy." *Id.* at 8-9.

Because the sheriff's deputy opened the zippered case without a warrant and because that action exceeded the scope of a permissible inventory, the deputy acted without authority of law. As a result, the search was not permissible under article I, section 7.

      1.      The Sheriff's Deputy Opened the Black Zippered Nylon Case without a Warrant

"In general terms, the authority of law required by article I, section 7 is satisfied by a valid warrant." *Miles*, 160 Wn.2d at 244. Because the sheriff's deputies did not obtain a warrant for their "methodical[]" search of the pickup truck or, more particularly, for their search of the black zippered nylon case, the sheriff's deputies could have had "authority of law" only if they operated within the scope of an exception to the warrant requirement.

      2.      The Inventory Exception Did Not Authorize the Sheriff's Deputy To Open the Black Zippered Nylon Case without a Warrant

      a. Overview of Inventories

Under article I, section 7, warrantless searches are per se invalid. *White*, 135 Wn.2d at 769 (citing *Hendrickson*, 129 Wn.2d at 70). "Despite this strict rule, there are 'jealously and carefully drawn exceptions' to the warrant requirement." *Id.* (internal quotation marks omitted) (quoting *Hendrickson*, 129 Wn.2d at 70).

One of those jealously and carefully drawn exceptions to the warrant

requirement, and the one that the State relies on here, is the noninvestigatory

custodial inventory. Such "inventory searches are limited searches for limited

purposes." *State v. Tyler*, 177 Wn.2d 690, 707, 302 P.3d 165 (2013) (citing

*Houser*, 95 Wn.2d at 153). "[U]nlike other searches, [custodial inventories] are

not conducted to discover evidence of crime."[14] *Houser*, 95 Wn.2d at 153.

Instead, the limited purposes of the inventory are to "(1) protect the vehicle

owner's (or occupants') property, (2) protect law enforcement agencies/officers

and temporary storage bailees from false claims of theft, and (3) protect police

officers and the public from potential danger."[15] *Tyler*, 177 Wn.2d at 701 (citing

---

[14] The majority agrees that warrantless inventories are "limited in both scope and purpose." Majority at 8. And it further agrees that inventories are not, and cannot be, investigatory searches. *Id.* Yet it justifies the scope of Deputy McKean's warrantless inventory here in part based on the fact that "Peck and Tellvik were arrested while in the process of burglarizing a home and were observed taking items from the home and its surroundings." *Id.* at 13; *see also id.* at 16. Stated differently, the majority justifies the warrantless inventory at issue here on the basis that it was necessary to look for evidence of the suspected burglary. That is an investigatory search, not an inventory.

[15] Even though exceptions to the warrant requirement are supposed to be jealously and carefully drawn, the majority, with no supporting analysis, adopts a new fourth justification for warrantless inventories: returning a clean vehicle to the true owner. Majority at 15 ("Additionally, inventorying the contents protects the vehicle's owner from being presented with drugs, guns, or property that simply does not belong to them when the stolen vehicle is returned."); *see also id.* at 5 (quoting one of the sheriff's

32

*White*, 135 Wn.2d at 769-70; *Houser*, 95 Wn.2d at 154; *State v. Gluck*, 83 Wn.2d 424, 428, 518 P.2d 703 (1974)). An inventory search must "be conducted in good faith" and "is permitted only to the extent necessary to achieve [those] purposes." *Id.* at 701 (citing *Houser*, 95 Wn.2d at 154), 708 (citing *Houser*, 95 Wn.2d at 155). It cannot be "enlarged on the basis of remote risks." *Houser*, 95 Wn.2d at 155. Otherwise, it would impermissibly "undermine the warrant requirement." *State v. Patton*, 167 Wn.2d 379, 386, 219 P.3d 651 (2009) (citing *Ladson*, 138 Wn.2d at 356).

The police may conduct a noninvestigatory custodial inventory when they lawfully impound a vehicle. *See, e.g., Tyler*, 177 Wn.2d at 702-03. And the police may lawfully impound a vehicle that has been reported stolen. *Houser*, 95 Wn.2d at 149. Here, there is no dispute that the sheriff's deputies lawfully impounded the pickup truck that Peck and Tellvik possessed at the time of their arrest.

---

deputies explaining that he prefers to take on the duty of care, arguably on behalf of the county, of returning vehicles hazard-free). Of course, the majority's rule giving special treatment to luggage and the like runs the risk of returning vehicles containing luggage that contains drugs and guns. But more importantly, permitting a search for drugs, guns, and other property is just a way of shoehorning an investigatory search into the narrow— and theoretically noninvestigatory—inventory exception to the warrant requirement. If the officers want to clean the vehicle before returning it to the owner, there is a simple solution: ask for consent to do so.

33

Accordingly, "[w]hile the validity of an inventory search is not at issue, the scope of such a search is." *White*, 135 Wn.2d at 770. So the question here is whether Deputy McKean had "authority of law" to open the "black zippered nylon case wedged under the passenger seat that looked like it was designed to hold compact disks."[16] WASH. CONST. art. I, § 7; *Peck*, slip op. at 4.

Our decisions in *Houser* and *White* control. *Houser* provides that when there is no sign of danger, no authority of law exists to open a closed container during a warrantless inventory. 95 Wn.2d at 156-59. Thus, Deputy McKean should have inventoried the black zippered nylon case as a sealed unit, as *Houser* requires. *Id.* *White* reaffirmed *Houser*. 135 Wn.2d at 765-71.

---

[16] The majority suggests that the motivations of the deputies bear on the lawful *scope* of a warrantless inventory. *See* majority at 13-14 ("Whether this was a proper inventory search turns, in part, . . . [on the conclusion that] the search was not pretextual. . . . Under these circumstances, it was proper for police to [open the zippered case]."); *see also id.* at 15 n.7 (the majority's conclusion that the search was not pretextual). I disagree. If officers exceed the scope of a lawful inventory, then the fruits of that search, to the extent it exceeded the scope of a lawful inventory, must be suppressed. *White*, 135 Wn.2d at 771-72. The result is the same if the officers feel that they have a good, nonpretextual reason to exceed the scope of a lawful inventory: there is no good-faith exception to article I, section 7's exclusionary rule. *State v. Afana*, 169 Wn.2d 169, 179-84, 233 P.3d 879 (2010).

34

                               b. *Houser* Required the Sheriff's Deputy To
                                    Inventory the Black Zippered Nylon Case as a
                                    Sealed Unit

In *Houser*, we identified three reasons why the trial court should have

suppressed evidence discovered inside a closed toiletry kit during a warrantless

inventory of a vehicle's trunk. First, we held that the police unlawfully decided to

impound the defendant's vehicle. 95 Wn.2d at 153. Second, we held that the

police unlawfully opened the vehicle's trunk during the warrantless inventory of

the vehicle. *Id.* at 156. Third, we held that the police unlawfully opened the

closed toiletry kit discovered in the vehicle's trunk during the warrantless

inventory. *Id.* at 158.

We explained that third holding in detail. Despite important "governmental

and societal interests in an inventory search," we concluded "that where a closed

piece of luggage in a vehicle gives no indication of dangerous contents, an officer

cannot search the contents of the luggage in the course of an inventory search

unless the owner consents." *Id.* "Absent exigent circumstances, a legitimate

inventory search only calls for noting such an item as a sealed unit," we explained.

*Id.* We further explained that exigent circumstances exist only when "the police

have reason to believe a container 'holds instrumentalities which could be

35

dangerous even when sitting idly in the police locker.'" *Id.* (quoting *United States v. Bloomfield*, 594 F.2d 1200, 1203 (8th Cir. 1979)).

In other words, *Houser* held that two of the purposes that generally provide authority of law for a warrantless inventory—protecting property from theft and defending against a potential false claim of theft—do not provide authority of law to open closed containers during an inventory. Only the third purpose—protecting police officers and the public from a realistic risk of danger—extends authority of law to open a closed container during a warrantless inventory. *Id.* Given that conclusion, the State's focus on preventing false claims, *see* Resp. to Amici at 12, has no bearing on the present cases without an accompanying argument that *Houser* is incorrect and harmful.

Instead of overruling *Houser*, the State would limit it. It notes that the police in *Houser* discovered the toiletry kit inside a shopping bag. Resp. to Amici at 9 (citing *Houser*, 95 Wn.2d at 147). In the State's view, that factual wrinkle meant that *Houser* did not "simply [say] that the police lacked authority to go inside the container in question." *Id.* But the toiletry kit's placement inside a shopping bag played no role in the court's analysis. And *Houser* said exactly what the State contends that it did not say: "By searching the contents of the closed toiletry bag in defendant's car, the police exceeded the bounds of a proper

36

inventory search." 95 Wn.2d at 159. That holding applies directly to Peck's and

Tellvik's cases.[17]

The State next argues that even if *Houser* applies, it is not controlling. It

claims that *Houser* lacks a sound foundation because "[i]t appears that the rule

announced in *Houser* was based upon the Fourth Amendment." *Peck* Corrected

Pet. for Discr. Review at 12; *Tellvik* State's Pet. for Discr. Review at 12. And the

State notes that "[s]even years after *Houser* was issued, the United States Supreme

Court clarified that the Fourth Amendment is not violated by an inventory of the

contents of closed containers found inside an impounded vehicle." *Peck* Corrected

Pet. for Discr. Review at 12 (citing *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct.

738, 93 L. Ed. 2d 739 (1987)); *Tellvik* State's Pet. for Discr. Review at 12

(same).[18]

---

[17] The State also argues that "[t]he rule of *Houser* is that *locked* containers cannot
be searched." Resp. to Amici at 8. But that characterization stretches *Houser* beyond
recognition, eliminating its third holding in its entirety. The whole premise of *Houser*'s
discussion of the toiletry kit is that the kit was an unlocked container. *See* 95 Wn.2d
at 156-59.

[18] The State is correct that officers may open closed containers during a
warrantless inventory without violating the Fourth Amendment. However, the fact that
opening a closed container does not necessarily violate the Fourth Amendment does not
mean that opening a closed container never violates the Fourth Amendment. For
example, the United States Supreme Court has made clear that a warrantless inventory

37

To be sure, *Houser* appears to rely on the Fourth Amendment. It cited United States Supreme Court decisions, and it dealt with concepts of reasonableness that are particular to federal law.

The trouble with the State's argument, however, is that this court effectively adopted *Houser*'s Fourth Amendment holding as an article I, section 7 holding in *White*. In that case, this court characterized *Houser* as "grounded in article I, section 7." *White*, 135 Wn.2d at 768. The dissent disagreed. *Id.* at 772 (Durham, C.J., dissenting) ("The majority erroneously concludes that *State v. Houser* was decided on state constitutional grounds." (citation omitted)). But the *White* majority is controlling law, not the *White* dissent. *See also State v. Boland*, 115 Wn.2d 571, 577-78, 800 P.2d 1112 (1990) (recognizing *Houser* as an article I, section 7 decision). And the State does not now argue that *White* is incorrect and harmful. *White*'s holding that *Houser* was grounded in article I, section 7 therefore controls.

As discussed above, *Houser* identified three grounds for its decision to suppress the contents of the closed toiletry kit. One might therefore argue, as the

---

violates the Fourth Amendment if the police department conducting the inventory lacks a policy regulating the opening of closed containers. *Florida v. Wells*, 495 U.S. 1, 4-5, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990).

*Houser* dissent did, that its holding that officers must inventory closed containers as sealed units constituted dictum. *See Houser*, 95 Wn.2d at 169 (Doran, J. Pro Tem., dissenting).

This argument also fails. In addition to rejecting that argument in *Houser* itself, this court rejected an analogous argument in *White*. In *White*, the State and amicus curiae argued that *Houser*'s conclusion that the police unlawfully opened the vehicle's trunk during the warrantless inventory search was dictum. 135 Wn.2d at 767 n.3. They reasoned that because the *Houser* court had held that the unlawfulness of the impound decision required suppression of the evidence, everything else that followed in the decision was surplusage. *Id.* But we held that the State and amicus curiae were "incorrect." *Id.* We explained:

> "Where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*." [(quoting *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S. Ct. 1235, 93 L. Ed. 1524 (1949)).] In *Houser*, the decision to suppress the evidence could rest on two rationales—the illegality of the impound or the illegality of the search. Simply because the unlawfulness of the impound was analyzed first does not make the analysis of the inventory search dicta.

*Id.* (some citations omitted). Thus, *Houser*'s conclusions about the illegality of the warrantless inventory were authoritative interpretations of the Washington Constitution.

*Houser*'s conclusion that the warrantless inventory was unlawfully overbroad might also be attacked as resting on two rationales—the illegality of opening the trunk and the illegality of opening the closed container. But again, "[s]imply because [one] was analyzed first does not make the analysis of the [second] dicta." *Id.*[19]

*Houser* is therefore controlling.[20] The State does not ask us to overrule it. Accordingly, the State and the majority's argument that officers may open closed containers, as long as they are unlocked, fails.

---

[19] *See also Boland*, 115 Wn.2d at 577-78 (recognizing *Houser*'s rule about the permissible scope of a warrantless inventory as a holding); *Simpson*, 95 Wn.2d at 193 (Utter, C.J., concurring) ("In *State v. Houser*, we held that the legal seizure of a toiletry bag does not automatically allow for a search of its contents." (citation omitted)); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991) (recognizing *Houser*'s rule about the permissible scope of a warrantless inventory as an authoritative statement of state law).

[20] That is precisely what the Court of Appeals said below and in similar cases. *See Peck*, slip op. at 8; *Tellvik*, slip op. at 5; *see also Wisdom*, 187 Wn. App. at 675; *State v. VanNess*, 186 Wn. App. 148, 163-64, 344 P.3d 713 (2015); *State v. Dugas*, 109 Wn. App. 592, 598-99, 36 P.3d 577 (2001); *cf. State v. Dunham*, 194 Wn. App. 744, 751, 379 P.3d 958 (2016) (recognizing propriety of warrantless inventory search of backpack's locked pocket, given particularized concerns about danger from knives).

40

### c. *White* Directs the Same Result as *Houser*

Even if *Houser* were not controlling, the logic of our decision in *White* leads to the same result. There are not separate rules for locked and unlocked closed containers; all closed containers must be inventoried as sealed units.

In *White*, the police conducted a warrantless inventory of an impounded vehicle. 135 Wn.2d at 765. "During this search, a trunk release button was found in the unlocked glove box which opened the locked trunk." *Id.* Inside the trunk, the police discovered "an unlocked fishing tackle box which, when opened, was found to contain [drugs] and drug paraphernalia." *Id.* The State sought to use that evidence to prosecute the defendant. *Id.*

When the case reached this court, we reaffirmed *Houser* and held that opening the trunk via the trunk release button violated *Houser*'s "bright line rule." *Id.* at 771-72. "Whether a key is needed to unlock the trunk or whether an interior release is used is of no distinction to the privacy interest of the individual under article I, section 7 of the Washington State Constitution." *Id.* at 771. In other words, we held that opening the trunk was unlawful even though the trunk was effectively unlocked.

We rejected the Court of Appeals' view that the accessibility of the searched item mattered. That court had explained:

> The risk of theft or unfounded claims becomes substantial when a car's trunk can be opened from an easily-accessible area of the passenger compartment. Implicit in the justification for warrantless inventory searches of the passenger compartment, including its unlocked glove compartment, is the recognition that these are areas a would-be thief can easily get into. . . . Because it is no great secret that some cars have trunk release levers in the glove compartment or by the driver's seat, the danger of theft of items left in the trunks of those cars is far greater than is the case if a car trunk can only be opened with a key.

*State v. White*, 83 Wn. App. 770, 779, 924 P.2d 55 (1996), *rev'd*, 135 Wn.2d 761.

Whatever the truth of that observation, we disagreed that it justified opening the closed-off space. 135 Wn.2d at 766. We emphasized the importance of privacy interests under article I, section 7. *Id.* at 767-68.

The easily opened trunk is no different from the black zippered nylon case. All that was required for entry to the trunk was pushing a button, an act no more difficult than unzipping a zippered case. And just as anybody with access to the interior of the vehicle in *White* could access the trunk, so too could anybody with access to the interior of the truck access the black zippered nylon case at issue here.[21] The State has not argued that *White* is incorrect and harmful. Thus, under

---

[21] The majority adopts a cramped reading of *White* that ignores the fact that the trunk was effectively locked only to those outside the vehicle. Majority at 12-13. Its position overlooks the reality that to those with access to the interior of the vehicle, opening the trunk was as easy as opening a middle-seat console or an overhead

*White* as well as *Houser*, opening the black zippered nylon case exceeded the scope of a permissible inventory.

> d. Our Glove Compartment Dicta Does Not Require a Different Result

It is certainly true that *Houser*'s and *White*'s holdings that article I, section 7 protects a person's private affairs in a closed container arguably stands in tension with *White*'s statement approving the officer's decision to open the glove compartment during the warrantless inventory. We stated:

> In *Houser*, we found police could search an unlocked glove compartment of an abandoned automobile during an inventory search because documents of ownership and registration are kept there and because the glove box is a place of temporary storage of valuables.

135 Wn.2d at 766-67. Indeed, the majority relies on the glove compartment exception, reasoning that "neither logic nor experience illuminates a difference between an unlocked glove compartment and an unlocked nylon case." Majority at 14.

---

sunglasses compartment—and to those without interior access, none of those compartments, including the trunk, could be opened, absent a forceful intrusion. The majority's analysis therefore turns on whether the black zippered nylon case was locked, despite the fact that not all containers can be locked (unless one wraps the container in chain and padlock) and, further, despite the facts that *this* container was zipped up, partially wedged under a seat, and within a vehicle, which is not ordinarily subject to police search. *See Valdez*, 167 Wn.2d at 777-78.

But this is not the case to resolve any tension between our treatment of closed containers and our treatment of glove compartments during warrantless inventories. There are three reasons why.

First, the State has not meaningfully briefed the rationale of *Houser*'s and *White*'s glove compartment statements, nor has it explained how that rationale also supports opening closed containers, such as the black zippered nylon case at issue here. The State made a single passing reference to the seeming glove compartment rule in a footnote in each of its petitions for review, *Peck* Corrected Pet. for Discr. Review at 12 n.3; *Tellvik* State's Pet. for Discr. Review at 12 n.3, and another single passing reference to that seeming rule in its response to amici, Resp. to Amici at 8. It did not file a supplemental brief in this court, and it did not brief the issue to the Court of Appeals—in either of the two consolidated cases. And given the State's contention that *Houser* was a Fourth Amendment decision, it is not obvious under what logic the State would extend the Fourth Amendment's treatment of glove compartments to article I, section 7.

Second, our statement in *Houser* about the glove compartment was dictum. *Houser* did not make a holding about inventorying the glove compartment, nor does its statement about the glove compartment appear necessary to any of its three holdings.

Third, *Houser*'s statement about the glove compartment was limited to an

"abandoned vehicle" with no indicia of ownership, on the theory that "documents

of ownership and registration are kept there." *White*, 135 Wn.2d at 766-67. This

sounds more like the community caretaking exception to the warrant requirement,

made for situations where the owner is unknown. That is not the situation here.[22]

---

[22] The majority attempts to draw on the rationale of the community caretaking exception by noting, "*Perhaps most importantly*, one of the officers testified that the [zippered case] 'could very well have registration documents in it.'" Majority at 15 (emphasis added) (quoting PRP (May 10, 2016) at 109; TRP (May 10, 2016) at 161). Respectfully, I believe this statement is incorrect, both factually and legally. First, the same officer who supplied that testimony also testified that he was looking for "drugs," "weapons," and anything "illegal" when he was conducting the search. PRP (May 10, 2016) at 104; TRP (May 10, 2016) at 156. The majority's accurate, but very limited, quotation of this "most important[]" testimony leaves an inaccurate impression of the officer's search.

Second, just as the scope of an inventory cannot be "enlarged on the basis of remote risks" of danger, *Houser*, 95 Wn.2d at 155, neither can it be enlarged on the basis of remote possibilities of locating custodial information. According to the same deputy, the zippered case looked "like a CD case." PRP (May 10, 2016) at 108; TRP (May 10, 2016) at 161. The officer said that there was "[n]o telling what could be in it." PRP (May 10, 2016) at 108; TRP (May 10, 2016) at 161. So the officer did not really testify that he believed the "CD case" contained registration documents; rather, he speculated about it.

Finally, the majority's approach ignores the fact that the officers had no reason to look for registration documents to determine whether the truck was stolen and who owned it. *They already knew*. The record shows that they had already entered the car's license plate number into a law-enforcement database, and they had already received information back that the vehicle had been stolen, had been missed, and had been reported stolen. PRP (May 10, 2016) at 30, 102; TRP (May 10, 2016) at 80, 154. The

*White*'s statement that we approved the opening of glove compartments during warrantless inventories thus appears to "be a stretch," as the Court of Appeals observed in *Wisdom*. 187 Wn. App. at 682 n.7.

In any event, it is inaccurate to state, as the majority does, that "we deemed intrusion into a car's unlocked glove compartment 'reasonable'" in *Houser*. Majority at 15 (quoting *Houser*, 95 Wn.2d at 155). Whether *White* created law about glove compartments is a different issue, and one that I would leave for another case in which the issue has actually been briefed.

CONCLUSION

The majority does more work than it lets on in its relatively quick, easy-reading 16 pages. It cautions that its "holding is limited," majority at 15, but, really, it quietly pulls the feet out from underneath our automatic standing doctrine, abandons article I, section 7's established method of analysis in favor of Fourth Amendment balancing, and perceives no privacy interests in personal belongings that people have shielded from public view.

I respectfully dissent.

---

factual scenario that justified the community caretaking search in *State v. Lynch* simply does not exist here. *See* 84 Wn. App. 467, 478, 929 P.2d 460 (1996) (recognizing that an officer may search "obvious source[s]" inside a vehicle for ownership information after that vehicle has been broken into and the identity of the owner—that is, the victim—is unknown).

Gordon McCloud, J.

Madsen, J.

Yu, J.

Fairhurst, C.J.